840 A.2d 967 (2004)
366 N.J. Super. 251
STATE of New Jersey, Plaintiff-Respondent,
v.
Marlene McALLISTER, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 2003.
Decided February 5, 2004.
*969 Robert Seelenfreund, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorneys; Mr. Seelenfreund, of counsel and on the brief).
Joseph Connor, Jr. Assistant Prosecutor, argued the cause for respondent (Michael M. Rubbinaccio, Morris County Prosecutor, attorneys; Mr. Connor, on the brief).
Russell J. Curley, Deputy Attorney General, argued the cause for amicus curiae (Peter C. Harvey, Attorney General, attorneys; Mr. Curley, on the brief).
Before Judges SKILLMAN, WELLS and FISHER.
*968 The opinion of the court was delivered by WELLS, J.A.D.
During Marlene McAllister's criminal trial, the judge denied her motion to suppress and admitted her bank records in evidence. The prosecutor had obtained those records by the service of grand jury subpoenas on her banks without prior notice to her. We hold, on exclusively state constitutional grounds that, from the date of this decision forward, because persons have a legitimate expectation of privacy in the record of their banking transactions, the State must either obtain a search warrant based upon probable cause before acquiring bank records or provide notice and a reasonable opportunity to object to the issuance of a grand jury subpoena duces tecum for such records. While we conclude it was error to admit the records obtained in this case for failure to proceed under either alternative, under the factual circumstances of this case, the error was harmless and we affirm McAllister's conviction.
McAllister was indicted in November 1999 on four counts of third-degree fraudulent use of a credit card in violation of N.J.S.A. 2C:21-6h; one count of fourthdegree forgery in violation of N.J.S.A. 2C:21-1a(2); and, one count of third-degree theft in violation of N.J.S.A. 2C:20-3. Prior to trial, the prosecutor moved to dismiss the first four of the above charges and a part of the theft count. The motion was granted. The trial proceeded on the forgery count and the remaining part of the theft count pertaining to the victim, George Uslar.
The jury trial consumed five days in January 2002 and resulted in McAllister's conviction of both counts. The following April, the judge sentenced McAllister to three years probation conditioned upon her serving 180 days in the county jail on the forgery and a concurrent term of two years probation conditioned upon her serving ninety days in the county jail on the theft count. Restitution was ordered in the sum of $35,616.04.
The facts as they emerged at trial are these. In October 1996, McAllister was hired to help George and Renee Ulsar, an elderly couple, around the house. Her job included running errands for the Ulsars, such as picking up their mail. In late 1997, George Ulsar began to suspect that McAllister was tampering with his mail. When by early 1998 he had not received his annual Merrill Lynch brokerage statement, he called its office and asked about the statement. Merrill Lynch advised the statement had been sent, but it offered to send another copy. On February 14, 1998, expecting the statement, Ulsar went to the *970 post office to pick up the mail, only to find that McAllister had been there before him.
Ultimately, however, Ulsar received a copy of the statement and obtained, as well, the one picked up by McAllister. On February 21, 1998, he compared the two and found they were not the same. The statement from the broker listed a series of checks totaling in excess of $35,000 drawn against his account that he had not signed or authorized. That day, Ulsar reported the matter to the Harding Township police, who, on March 6, 1998, after a preliminary investigation, arrested McAllister at her place of employment. When one of the officers asked if there was anything she wanted to bring to the station with her, McAllister asked for the purse in her car. An officer went to McAllister's car, retrieved the purse and handed it to her. At the station, the purse and several of the items in it, including her checkbook register and other papers, were inventoried and reviewed by the investigators.
On March 8, 1998, the prosecutor executed, in the name of the county clerk, a grand jury subpoena duces tecum directed to Chase Manhattan Bank at its offices in New York City. The subpoena directed the bank to appear before the grand jury on March 17, 2002 and bring with it four records of McAllister's account: (1) a copy of her signature card; (2) the bank's statements for June, July, August and September 1997; (3) the identity of any other accounts in the name of Marlene McAllister; and (4) copies of deposit items that may be requested after review of statements. Another such subpoena was issued requiring an appearance before the grand jury on September 9, 1998 by the United National Bank and demanding records pertaining to McAllister's auto loan. It sought copies of paperwork pertaining to that loan to include payment history from August 1996 to September 1997. Both banks complied with the subpoenas and provided the records. Neither the prosecutor nor the banks notified McAllister that her banking records were being sought in connection with the investigation.
On the first day of trial, the judge heard argument on a motion to suppress McAllister's bank records. Finding no New Jersey authority directly on point, the judge relied on the United State Supreme Court decision in State v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), to deny the application. He was persuaded by the Court's conclusion that there is no legitimate expectation of privacy in bank records.
McAllister's checkbook register, inventoried the day she was arrested, and the Merrill Lynch statements from which Ulsar had discovered the alleged defalcations were admitted in evidence. In accord with his earlier ruling, the judge admitted in evidence McAllister's Chase Manhattan bank statements and the auto loan payment record from United National Bank produced under subpoena. The Merrill Lynch cash management account statements and its cancelled checks showed six checks cleared the account signed between June 1, 1997 and August 1, 1997, which Ulsar denied signing or authorizing. Three of these checks were made to specific payees and three to "McAllister" or to "M. McAllister." One of the named payees on two of the checks was United National Bank where McAllister had an auto loan. The three checks made out to McAllister were deposited into her Chase Manhattan checking account and duly recorded in her check register.
McAllister raises a single point on appeal:
THE TRIAL COURT'S DECISION TO DENY THE MOTION TO SUPPRESS WAS INCORRECT; THE STATE OBTAINED *971 DEFENDANT'S BANK RECORDS WITHOUT A SEARCH WARRANT, THEREBY VIOLATING HER STATE CONSTITUTIONAL RIGHTS. N.J. CONST. ART. I, PAR. 7.

I
We begin our analysis with Miller, the case upon which the trial judge relied. There, Miller was convicted of possessing an unregistered still and various related charges. Id. at 436, 96 S.Ct. at 1621, 48 L.Ed.2d at 75. Federal agents, via subpoenas duces tecum served on two banks where Miller had accounts, viewed microfilms of his records and obtained access to copies of certain checks and deposit slips. Ibid. Miller moved to suppress those records. Ibid. The district court denied his motion and eventually the records were admitted into evidence to establish certain overt acts necessary to prove the charges against him. Id. at 437, 96 S.Ct. at 1621, 48 L.Ed.2d at 75. The circuit court of appeals reversed. Ibid. Upon further appeal to the United States Supreme Court, it reversed the circuit court, restoring the district court decision. Ibid. The Supreme Court stated:
On their face, the documents subpoenaed here are not respondent's "private papers." Unlike the claimant in Boyd [v. U.S., 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746], respondent can assert neither ownership nor possession. Instead, these are the business records of the banks. "[B]anks are ... not ... neutrals in transactions involving negotiable instruments, but parties to the instruments with a substantial stake in their continued availability and acceptance." The records of respondent's accounts, like "all of the records (which are required to be kept pursuant to the Bank Secrecy Act,) pertain to transactions to which the bank was itself a party."
....
Even if we direct our attention to the original checks and deposit slips, rather than to the microfilm copies actually viewed and obtained by means of the subpoena, we perceive no legitimate "expectation of privacy" in their contents. The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. The lack of any legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act, the expressed purpose of which is to require records to be maintained because they "have a high degree of usefulness in criminal tax, and regulatory investigations and proceedings."
The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.
[Id. at 440-43, 96 S.Ct. at 1623-24, 48 L.Ed.2d at 77-79. (citation omitted).]
Congress reacted somewhat unfavorably to Miller. In 1978, it passed the Right to Financial Privacy Act (RFPA). 12 U.S.C.A. 3401 to -22; Young v. U.S. Dept. *972 of Justice, 882 F.2d 633, 636 (2d Cir.1989). An authoritative statement of the purposes of the Act and some of its central provisions were succinctly described in McDonough v. Widnall, 891 F.Supp. 1439 (D.Colo.1995). The Court wrote:
Congress passed the RFPA in response to the Supreme Court's holding that a bank customer has no constitutionally protected privacy interest in bank records. The Act provides statutory protection against unrestricted access to financial records to "fill the void in ... Federal law [left by Miller]." Congress and the executive regard the Act as a compromise between a "bank customer's right of financial privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations."
....
"The most salient feature of the [RFPA] is the narrow scope of the entitlements it creates." Indeed, the Act carefully limits the types of records it protects. However, the Act contains strict procedural requirements for alternative methods to obtain financial records. For purposes of the Act, Congress defines "government authority" to mean "any agency or department of the United States, or any officer, employee, or agent, thereof."
The RFPA "provid[es] that the government cannot gain access to a bank customer's financial records or other information without first complying with the notice and procedure requirements of the RFPA." The RFPA requires federal agencies "to follow the procedures established by this title when they seek an individual's records."
[Id. at 1447-48 (citation omitted).]
The RFPA did not preempt state laws regarding disclosure of a depositor's information by financial institutions. Foxworth v. Trustmark Nat. Bank, 934 F.Supp. 218, 222 (S.D.Miss.1996). Nor, by its very terms, does it apply to state law enforcement agencies. 12 U.S.C.A. § 3401(3); In re Grand Jury Applications for Court-Ordered Subpoenas, 142 Misc. 2d 241, 536 N.Y.S.2d 939 (App.Div.1988). More significantly, the RFPA granted an exception to its general rule of affording privacy in bank records where a grand jury seeks them via a duly issued subpoena. 12 U.S.C.A. § 3413(i). Under that provision, not only may a grand jury obtain the records by subpoena but the court may direct that the financial institution not notify the depositor of the demand for the depositor's records. Ibid. Nonetheless, despite these restrictions on the scope of the RFPA, as a general proposition the era of untrammeled access to an individual's bank records by federal government authorities was short lived.
State constitutions may set a higher standard of constitutional rights than imposed by the Federal constitution. Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967). On that generally accepted principle, while a number of state courts, following Miller, also concluded that their respective constitutions did not provide individuals with a legitimate expectation of privacy in their bank records, see State v. Schultz, 252 Kan. 819, 850 P.2d 818, 834 (1993); State v. Klattenhoff, 71 Haw. 598, 801 P.2d 548, 552 (1990); State v. Fredette, 411 A.2d 65, 67 (Me.1979), five states have departed from the Miller rationale on the issue. See State v. Thompson, 810 P.2d 415, 418 (Utah 1991); Winfield v. Div. Of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985); People v. Jackson, 116 Ill.App.3d 430, 72 Ill.Dec. 153, 452 N.E.2d 85, 89 (1983); Charnes v. DiGiacomo, 200 Colo. 94, 612 P.2d 1117, 1120-21 (1980); Commonwealth v. DeJohn, 486 Pa. 32, 403 *973 A.2d 1283, 1291 (1979). A sixth state, California, had determined prior to Miller that there was an expectation of privacy in bank records. Burrows v. Superior Court, 13 Cal.3d 238, 118 Cal.Rptr. 166, 170, 529 P.2d 590 (1974). That case, the earliest directly on point, states the case for privacy in bank record in no uncertain terms.
There, during the course of an investigation of an attorney suspected of theft of his client's funds, the police, acting under a search warrant, found a number of banking records in his office. Id. at 166-67, 529 P.2d 590. They were not, however, complete. Id. at 167, 529 P.2d 590. One of the detectives, acting without any color of authority, persuaded several banks to voluntarily turn over their records of the attorney's accounts. Ibid. The trial judge declined to suppress the records thus obtained from the attorney's banks and he appealed. Ibid. The Court reviewed the federal history of the privacy of bank records as it then stood. Id. at 170-71, 529 P.2d 590. Its analysis of the expectation of privacy in bank records followed:
The underlying dilemma in this and related cases is that the bank, a detached and disinterested entity relinquished the records voluntarily. But that circumstance should not be crucial. For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography. While we are concerned in the present case only with bank statements, the logical extension of the contention that the bank's ownership of records permits free access to them by any police officer extends far beyond such statements to checks, savings, bonds, loan applications, loan guarantees, and all papers which the customer has supplied to the bank to facilitate the conduct of his financial affairs upon the reasonable assumption that the information would remain confidential. To permit a police officer access to these records merely upon his request, without any judicial control as to relevancy or other traditional requirements of legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power.
Cases are legion that condemn violent searches and invasions of any individual's right to the privacy of his dwelling. The imposition upon privacy, although perhaps not so dramatic, may be equally devastating when other methods are employed. Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices.
[Id. at 172, 529 P.2d 590 (footnote omitted).]
The Burrows Court held that the bank records or copies thereof should have been suppressed because the prosecutor acquired them without the benefit of legal process as the result of an illegal search and seizure. Id. at 175, 529 P.2d 590.
We note that our neighbor, Pennsylvania, adopted the Burrows reasoning as to a bank customer's expectation of privacy in *974 bank records in its decision in DeJohn, supra, 403 A.2d at 1289-91. We hasten to point out, however, that courts in four of the six states, including Pennsylvania, that have found an expectation of privacy in bank records have also held that the privacy interest in the confidentiality of such records was sufficiently protected by the service of subpoenas duces tecum issued under the aegis of grand jury proceedings or other form of official state investigation even though such subpoenas did not require prior judicial approval or prior notice to the bank customer. See e.g. Jackson, supra, 72 Ill.Dec. 153, 452 N.E.2d at 89-90.
The underlying premise of these rulings appears to be that while an expectation of privacy in bank records exists, it gives way to equal or greater compelling state need for effective investigations of regulated industries or of suspected criminal activity. That premise may, in turn, rest on an assumption that when it comes to grand jury investigations a court exercises supervisory control or oversight sufficient to curb excesses of prosecutorial zeal in obtaining otherwise private information.
Colorado and California, on the other hand, require that a subpoena served on a bank seeking a customer's records must be made returnable only after notice to the customer and an opportunity given to move to quash it based upon a lack of probable cause. People v. Mason, 989 P.2d 757, 759-60 (Colo.1999) (holding that the government may use a subpoena duces tecum to obtain bank record so long as the defendant has the opportunity to challenge the subpoena for lack of probable cause). In California, under a comprehensive statute, The Right of Privacy Act, Cal. Gov.Code § 7460, et seq., enacted after Burrows, financial records may be obtained by authorization of the customer, by administrative subpoena, by search warrant, or by judicial subpoena or subpoena duces tecum. Cal. Gov.Code § 7460(a)(1)(4). By a further provision, § 7676(b)(1), the statute requires that a grand jury subpoena duces tecum may issue for financial records in the course of a criminal investigation only if signed by a judge preceded by a showing that there exists a reasonable inference that a crime has been committed and that the financial records sought are reasonably necessary to the investigation. Cal. Gov.Code § 7676(b)(1). The statute requires that the subpoena be made returnable in no less than ten days and that notice to the financial institution and its customer be given such that a motion to quash may be made and determined. Cal. Gov.Code § 7676(a)(1)-(3); Bd. of Med. Quality Assurance v. Gherardini, 93 Cal.App.3d 669, 156 Cal.Rptr. 55 (1979).

II
In New Jersey, in a case decided before Miller, In re Addonizio, 53 N.J. 107, 248 A.2d 531 (1968), the Court ruled, entirely on Fourth Amendment grounds, that a grand jury subpoena duces tecum was properly issued to compel the production of bank and brokerage firm records of Hugh J. Addonizio, the then Mayor of Newark. Id. at 130-136, 248 A.2d at 544-47. While the justices, presaging Miller, declined to recognize a privacy interest in such records under the Fourth Amendment, we conclude that Addonizio does not compel a similar result under the New Jersey Constitution.
Article I, § 7 of our State Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to *975 be searched and the papers and things to be seized.
The clause has been construed as providing a broader range of privacy protections than those afforded under the Fourth Amendment. For instance, our Supreme Court, unlike the United States Supreme Court, has found a protected zone of privacy in records generated by a pen register, a device which, when placed on a person's phone line, identifies all local and long distance telephone numbers dialed over that line, whether completed or not. Compare Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), with State v. Hunt, 91 N.J. 338, 345-348, 450 A.2d 952, 955-57 (1982). Furthermore, our Court, again in contrast to the United States Supreme Court, has found an expectation of privacy in garbage left in opaque containers at curbside for collection by public employees. Compare California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) with State v. Hempele, 120 N.J. 182, 206-08, 576 A.2d 793, 805-06 (1990).
The trial judge found Hunt and Hempele "instructive but not dispositive." He relied on Miller and found there was no reasonable expectation of privacy in bank records. We disagree. In Hunt, the Court identified three factors it considered significant in determining that a cloak of privacy shields telephone numbers dialed from the privacy of a home. First, it considered New Jersey's "established policy of providing the utmost protection for telephonic communications." Hunt, supra, 91 N.J. at 345, 450 A.2d at 955. See generally N.J.S.A. 2A:156A-1 to -34; Morss v. Forbes, 24 N.J. 341, 363, 132 A.2d 1, 13 (1957). Second, it concluded that technological developments in communications had enlarged the concept of what is "home," and found that the telephone is an essential instrument in carrying out personal affairs. Hunt, supra, 91 N.J. at 346, 450 A.2d at 955-56. The Court noted that both state and federal law protects the content of telephone conversations under wiretapping laws requiring a warrant before phone lines may be tapped. Ibid. Third, the Court pointed out that the privacy afforded telephone communications is not shed because dialing information is necessarily shared with the telephone company itself in the ordinary course of its business. Id. at 347, 450 A.2d at 956.
Similarly in Hempele, the Court found a reasonable expectation of privacy in opaque garbage containers placed at curbside emerges from the fact that "people's most private traits and affairs can be found in their garbage." Hempele, supra, 120 N.J. at 201, 576 A.2d at 802. It concluded that general social norms would make persons upset if they saw a neighbor or a stranger "sifting through their garbage, perusing their discarded mail, reading their bank statements, looking at their empty pharmaceutical bottles, and checking their receipts to see what videotapes they rent." Ibid., 576 A.2d at 803 Furthermore, the Court found support for such an expectation of privacy in the fact that most containers which conceal their contents from public view, such as handbags, locked attache cases and suitcases, are afforded protection under the Fourth Amendment. Id. at 202, 576 A.2d at 803. Lastly, the Court also concluded that there is no diminution in the expectation of privacy in a person's garbage merely because it is vulnerable, by depositing it for pick-up by the trash collectors, to the eyes of third persons. Id. at 204, 576 A.2d at 804.
Based on considerations parallel to both Hunt and Hempele, we hold that there exists a reasonable expectation of privacy in a person's bank records. Initially, we conclude that the RFPA, adopted following Miller, set the more compelling *976 policy direction on this issue in 1978, when it limited access by government authorities to information contained in the financial records of any customer held by a financial institution. We thus find ourselves in accord with those states that have rejected the Miller rationale and found that an expectation of privacy arises in people's bank records. We are in full accord with Justice Mosk's articulation of the pervasiveness of the need to make and maintain bank records as an incident of private, personal financial life and participation to the fullest in modern economic life. Burrows, supra, 118 Cal.Rptr. at 172, 529 P.2d 590. We note that Justice Mosk took a similar view with respect to toll billing records. People v. Blair, 25 Cal. 3d 640, 159 Cal.Rptr. 818, 826, 602 P.2d 738 (1979). His view departing from Miller was cited at length and with approval in Hunt. Hunt, supra, 91 N.J. at 348, 450 A.2d at 957.
The discomfort in finding a stranger poring over one's checkbook, deposit slips and cancelled checks is equal to seeing someone sifting through his or her garbage, Hempele, or reviewing a list of dialed telephone numbers called from home, Hunt. Banks, like telephones, are an extension of one's desk or home office. Indeed, as in the case of the telephone, technological advances in the form of personal computers with access to the internet and electronic banking services have made those services available to the homes of its depositors. Bank records kept at home could not be seized in the absence of a duly issued search warrant based upon probable cause and they should not be vulnerable to viewing, copying, seizure or retrieval simply because they are readily available at a bank.
Finally, the fact that financial affairs are memorialized in written records of banks or maintained in their electronic data systems to which, as part of its legitimate business, a bank's employees have access, does not suggest that persons have any sense that their private and personal traits and affairs are less confidential when they deal with their bank than when they make telephone calls or put out their garbage. The repose of confidence in a bank goes beyond entrustment of money, but extends to the expectation that financial affairs are confidential except as may be reasonable and necessary to conduct customary bank business.

III
The ability of a prosecutor to encourage a grand jury to indict is legendary. Even more unlimited is the prosecutorial discretion to issue and serve subpoenas in the name of the grand jury. In 1979, we ruled on the parameters of the prosecutor's power to issue grand jury subpoenas duces tecum. In re Grand Jury Subpoena Duces Tecum, 167 N.J.Super. 471, 401 A.2d 258 (App. Div.1979). There, the appellant questioned the validity of a State grand jury subpoena duces tecum on the ground that no proofs of any kind were submitted by the State to the court to sustain its validity. Id. at 472, 401 A.2d at 258-59. Relying on a federal district court decision in Rhode Island, In re Grand Jury Subpoena Duces Tecum, etc., 391 F.Supp. 991, 995 (D.R.I.1975), we held:
Where, as here, the validity of a grand jury subpoena duces tecum is challenged, the State need establish preliminarily merely (1) the existence of a grand jury investigation and (2) the nature and subject matter of that investigation, in order to overcome the challenge.
....
Insofar as relevancy is concerned, all that need be shown by the State is that *977 the documents subpoenaed "bear some possible relationship, however indirect, to the grand jury investigation." The proposition urged by appellant that there must be a showing "that a substantial nexus exists between the subpoenaed documents and the grand jury investigation" is without substance or merit.
[Ibid. (citation omitted).]
Furthermore, those predicate facts may be established without formal proofs, but by the "simple representation of counsel to the court that a grand jury investigation has been commenced and a recitation of the nature of the investigation." Ibid.
Two years later we held that the prosecutor need not have prior authorization from the grand jury and, indeed, the grand jury need not even be in session so long as there is one in session when the subpoena is made returnable. State v. Hilltop Private Nursing Home, Inc., 177 N.J.Super. 377, 396-97, 426 A.2d 1041, 1052 (App.Div.1981). We stated:
The resolution of the issue before us as to whether the prosecutor can issue a subpoena on behalf of the grand jury lies somewhat between the prohibition against "office subpoenas" and the prosecutor's duty to marshal evidence before the grand jury.
....
It does appear, however, that the vast majority of courts condone the issuing of subpoenas without the grand jury's permission as long as they are returnable on a day when the grand jury is sitting.
[Id. at 389-91, 426 A.2d at 1048-49.]
The underpinning of these holdings is that the grand jury is an institution that both investigates and indicts and that a prosecutor cannot be hamstrung in his or her ability to marshal evidence before the grand jury. In re Tuso, 73 N.J. 575, 580, 376 A.2d 895, 897 (1977).
A further basis of the untrammeled right to issue and serve subpoenas duces tecum derives from Rule 1:9-2, which applies to proceedings before the grand jury. Hilltop, supra, 177 N.J.Super. at 392, 426 A.2d at 1049-50. That rule authorizes the issuance of such subpoenas without describing a single limiting condition.
The State urged at oral argument that the court in the person of the vicinage Assignment Judge could note the return of subpoenas of bank records to the grand jury through his or her knowledge of its agenda. That knowledge would place the Assignment Judge in a position to make inquiry and exercise appropriate supervision in the matter. We are unaware of any formal procedure embodied in the rules let alone any regular practice of providing Assignment Judges grand jury agendas. Invariably, the proceedings of the grand jury are secret and little, if anything, is known of its day to day business, including knowledge that subpoenas duces tecum have been made returnable before it.
While, generally, we have no intent to unsettle the longstanding law governing grand jury proceedings, we are constrained to conclude that under New Jersey's Constitution, as construed in Hunt and Hempele, the public's legitimate expectation of privacy in bank records is insufficiently protected by any established restraint upon the broad power of prosecutors to issue and serve grand jury subpoenas duces tecum upon banks in the course of investigating suspected criminal activity.
We part company with those states that have held the processes of issuing and serving a grand jury subpoena is a curb on prosecutorial power sufficient to overcome the expectation of privacy in bank records. We hold, as have the courts in California *978 and Colorado, that more is required. Accordingly, a prosecutor must either obtain a search warrant based upon probable cause to acquire bank records or must provide notice and a reasonable opportunity to object to the issuance of a grand jury subpoena duces tecum for such records. Following the lead of both California and Colorado, a motion to quash such a subpoena should be granted in the absence of proofs sufficient to establish probable cause. Burrows, supra, 118 Cal.Rptr. at 175, 529 P.2d 590; Cal. Gov.Code, § 7476(b)(1); Mason, supra, 989 P.2d at 759-60. It follows that the scope of grand jury subpoenas duces tecum permitted by our ruling in In re Grand Jury Subpoena Duces Tecum will reflect the narrower boundaries defined by the "particularity" standards applicable to search warrants.
We foresee no breach of the secrecy attendant to investigations of the grand jury resulting from our ruling and urge steps to maintain the confidentiality of the application for and service of a search warrant or the hearing on any motion to quash a grand jury subpoena duces tecum and to limit disclosure of the any records returned under the warrant or the subpoena to prosecutors marshaling evidence for the grand jury and to the grand jury itself.
As the Supreme Court did in Hunt, and for the same reasons, except for this case, the decision we adopt today should be applied only to bank records sought after the date of our decision. Hunt, supra, 91 N.J. at 348-49, 450 A.2d at 957.

IV
Notwithstanding that McAllister's bank records were delivered to the prosecutor in response to subpoenas that did not comply with our present holding and which were admitted in evidence against her, we are satisfied that the error was harmless. Also admitted without objection were McAllister's own checkbook register that showed her Chase Account number and the cancelled checks from Ulsar's Merrill Lynch statements endorsed for deposit to an account bearing that number. Those records alone closed the circle of the withdrawal of Ulsar's funds from his cash management account and their deposit in McAllister's account. The Chase Manhattan and United National Bank records obtained by subpoena were thus cumulative and unnecessary to prove any element of the offenses charged. In the face of McAllister's defense that the money she obtained from Ulsar was loan proceeds, a defense which admitted receipt of the money, we conclude that the bank records neither aided the State's case nor hurt McAllister's defense. Accordingly, in this case, the judge's ruling admitting the evidence produced under subpoena did not have the capacity to produce an unjust result. R. 2:10-2.
Nor did the use of improperly obtained bank records lead investigators to admissible evidence. Indeed, in this case, the investigation based upon evidence properly obtained led the investigators to seek bank records by subpoena to confirm what McAllister's and Ulsar's records already demonstrated. Accordingly, we find no basis upon which to upset McAllister's conviction on the ground of the fruit of the poisoned-tree doctrine.
Affirmed.