875 A.2d 866

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MARLENE MCALLISTER, DEFENDANT–RESPONDENT.

Argued January 4, 2004—Decided June 20, 2005.

Wallace, J., concurred in result and filed a separate opinion in which LaVecchia and Rivera-Soto, JJ., joined.

*Joseph F. Connor, Jr.*, Assistant Prosecutor, argued the cause for appellant (*Michael M. Rubbinaccio*, Morris County Prosecutor, attorney).

*Mark H. Friedman*, Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars*, Public Defender, attorney).

*Russell J. Curley*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Peter C. Harvey*, Attorney General, attorney).

*John D. Caruso* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Garces & Grabler*, attorneys).

Justice ZAZZALI delivered the opinion of the Court.

In this appeal, we consider whether account holders have a reasonable expectation of privacy in their bank records, and, if so, the extent of the protection that we should afford that interest.

In 1996, an elderly couple employed defendant as a caretaker. The couple became suspicious that she was stealing money from their bank accounts. They notified the police, and, following an investigation, the police arrested defendant. An inventory search of defendant's purse revealed a check register that recorded deposits of the couple's money into defendant's accounts. The prosecutor then executed grand jury subpoenas duces tecum on defendant's banks requesting her account records. The banks complied, and the records confirmed the deposits.

The Appellate Division held that the long-standing practice of obtaining bank records with a grand jury subpoena duces tecum without notice to the account holder is contrary to state constitutional norms. The panel concluded that this Courts evolving interpretation of the right to privacy renders bank records the property of the account holder, not the bank. Under the panels holding, a prosecutor has two options: either demonstrate probable cause before acquiring an account holder's records from a bank, or provide notice to the account holder and an opportunity to object.

We hold that, under the New Jersey Constitution, citizens have a reasonable expectation of privacy in bank records. However, we conclude that existing grand jury subpoena procedures sufficiently protect that expectation of privacy. Accordingly, we reject both the application of a probable cause standard to grand jury subpoenas and the imposition of a notice requirement. Nonetheless, although notice to account holders is not constitutionally required, additional protections may be desirable as a matter of policy. Therefore, in the exercise of our supervisory authority, we will request that the Criminal Practice Committee study our grand jury procedures and recommend whether the Court should consider additional safeguards for account holders.

I.

In the mid–1990s, Harding Township residents George and Renee Uslar were elderly and in poor health. In 1996, the Uslars hired defendant Marlene McAllister to help them run errands, go grocery shopping, and pick up their mail.

The Uslars were financially secure, with significant holdings in two separate Merrill Lynch cash management accounts and a joint account at Chase National Bank. Early each year, Mr. Uslar received a statement from Merrill Lynch that listed all checks paid from his account in the prior year, which he carefully reviewed for income-tax purposes. By late 1997, Mr. Uslar suspected that defendant was tampering with his mail.

In February 1998, an employee of a small New Jersey printing company received an order to create a "fake original" Merrill Lynch annual statement. Creating a fake original requires the use of overlays and a process known as "bleeding" the document, which allows the printer to delete certain items from the original while leaving other features untouched in the newly printed copy. The employee later identified defendant in court as the person who submitted the order.

In early 1998, Mr. Uslar did not receive his annual statement on time and requested that Merrill Lynch send him another copy. Expecting the replacement copy, he went to the post office to retrieve his mail on a Saturday morning. However, the window clerk informed him that defendant had already picked up the mail. That revelation troubled Mr. Uslar because defendant did not work on Saturdays.

Several weeks later, Mr. Uslar finally received a copy of his Merrill Lynch statement. The statement documented a $30,000 check drawn on his account that he had not written or authorized. The check was endorsed by "McAllister" and marked with an account number. Mr. Uslar promptly called the police. Further investigation revealed that three of Mr. Uslar's monthly statements from 1997 had pages missing. He later testified that he

never separated his bank statements and that defendant had been picking up the mail during that summer. In addition to the $30,000 check, Mr. Uslar discovered a series of five checks that he neither issued nor authorized totaling over $5,000 and made payable to several banks and to "McAllister."

Harding Township police subsequently arrested defendant. At the police station, officers examined her purse and catalogued its contents as part of a routine inventory search. Among the items found was a checkbook for defendant's account at Chase Manhattan Bank. The checkbook bore the same account number that appeared on three of the checks drawn on Mr. Uslar's account. Deposits recorded in defendant's check register and several deposit slips found in the purse corresponded in date and amount with the series of unauthorized checks.

The prosecutor then executed a grand jury subpoena duces tecum on the New York City branch of Chase Manhattan Bank where defendant maintained an account. The subpoena ordered the bank to appear before the grand jury to produce several documents detailing defendant's financial records: a copy of defendant's signature card; her checking account statements; information identifying any other accounts in defendant's name; and copies of deposit items the grand jury might request after review of the other documents. The grand jury issued another subpoena duces tecum to United National Bank requesting information related to defendant's car loan. Both banks complied with the subpoenas and provided the records. Neither the banks nor the prosecutor notified defendant that her bank records were the subject of a grand jury investigation.

The grand jury indicted defendant for third-degree theft, *N.J.S.A.* 2C:20–3; fourth-degree forgery, *N.J.S.A.* 2C:21–1a(2); and four counts of third-degree fraudulent use of a credit card, *N.J.S.A.* 2C:21–6h. Before trial, the State moved to dismiss the four counts of credit card fraud and an allegation of the theft count. The trial court granted the State's motion, and defendant was tried on the forgery count and the remaining theft allegation.

Defendant filed a pretrial motion to suppress the bank records. She claimed that, rather than use a grand jury subpoena, the State was obligated to obtain a search warrant predicated on probable cause to lawfully acquire her bank records. Concluding that New Jersey law did not resolve the issue, the trial court turned instead to *United States v. Miller*, 425 *U.S.* 435, 96 *S.Ct.* 1619, 48 *L.Ed.*2d 71 (1976). Relying on the Supreme Court's conclusion in *Miller* that individuals have no legitimate expectation of privacy in their bank records, the trial court denied defendant's motion and admitted the records into evidence.

At trial, the State introduced both defendant's checkbook register obtained during the inventory search and the records provided by the banks. The jury subsequently convicted defendant of both the forgery and theft counts. The court sentenced defendant to 180 days imprisonment with three years probation on the forgery count and a concurrent 90–day prison term with two years probation on the theft count. The court also ordered defendant to pay more than $35,000 in restitution.

Defendant appealed her conviction, contending that the State's acquisition of her bank records without a search warrant violated her rights under article I, paragraph 7 of the New Jersey Constitution. *State v. McAllister*, 366 *N.J.Super.* 251, 840 *A.*2d 967 (App.Div.2004). The Appellate Division agreed with part of her argument:

> [B]ecause persons have a legitimate expectation of privacy in the record of their banking transactions, the State must either obtain a search warrant based upon probable cause before acquiring bank records or provide notice and a reasonable opportunity to object to the issuance of a grand jury subpoena duces tecum for such records.
>
> [*Id.* at 254, 840 *A.*2d 967 (italics omitted).]

The panel, however, affirmed defendant's conviction because the State's failure to follow either alternative was harmless error. *Ibid.* The court reached that conclusion because defendant's own checkbook register, validly acquired during an inventory search, included her Chase account number, which matched the number of the account where Mr. Uslar's checks were deposited. *Id.* at 268,

840 *A.*2d 967. Thus, the panel considered the bank records obtained by subpoena to be "cumulative and unnecessary to prove any element of the offenses charged." *Id.* at 268–69, 840 *A.*2d 967.

The State, represented by the Morris County Prosecutor's Office, petitioned this Court for certification. We stayed the Appellate Division decision and granted the State's petition. 180 *N.J.* 151, 849 *A.*2d 183 (2004). We also granted amicus curiae status to the New Jersey Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

## II.

The State maintains that "New Jersey has no tradition of enhanced protection for bank records." According to the State, the "limited intrusion" of a grand jury subpoena overcomes any expectation of privacy a citizen might have in bank records. The State also disagrees with the Appellate Division's conclusion that grand jury subpoenas must be supported by probable cause. Noting that no other jurisdiction requires probable cause to support a grand jury subpoena, the State urges this Court to reaffirm the preexisting standard applicable to grand jury subpoenas duces tecum—that the documents requested are relevant to the grand jury's investigation. Finally, the State contends that notifying the subject that the State seeks his or her bank records "would violate grand-jury secrecy and play havoc with the grand-jury's investigative function."

The Attorney General, as amicus curiae, echoes the position of the prosecutor. He argues that citizens have no expectation of privacy in bank records and urges this Court to remain consistent with federal law and uphold the broad investigatory power of grand juries.

Defendant asks us to adopt the Appellate Division's conclusion and hold that the New Jersey Constitution provides greater protection for bank records than does its federal counterpart. She advocates that this Court reject the State's arguments because the appellate court ruling is "far more faithful" to the State

Constitution and our jurisprudence. Defendant draws our attention to the efforts of other States and the federal government to afford privacy to bank records despite *United States v. Miller, supra,* 425 *U.S.* 435, 96 *S.Ct.* 1619, 48 *L.Ed.*2d 71. She also emphasizes that technological advances have reduced personal contact between financial institutions and their customers. Such developments, defendant asserts, refute the State's argument that recognizing a privacy interest in bank records conflicts with the reality of modern commercial banking. Accordingly, defendant maintains that bank records should not be turned over without a warrant predicated on probable cause.

The ACDL, as amicus curiae, emphasizes that a grand jury subpoena duces tecum does not adequately protect citizens' expectation of privacy in their bank records. The ACDL claims that only a requirement that the State demonstrate probable cause would provide the proper protection.

### III.

We first consider the interest that account holders have in the privacy of their bank records. To provide context for our discussion, we begin by comparing federal and New Jersey law on the issue.

### A.

*United States v. Miller, supra,* 425 *U.S.* 435, 96 *S.Ct.* 1619, 48 *L.Ed.*2d 71, is the seminal United States Supreme Court opinion concerning an individual's interest, under the Federal Constitution, in financial records held by a bank. In that case, while investigating an illegal distillery, federal agents served grand jury subpoenas on the defendant's banks, demanding that they produce his account records. *Id.* at 437–38, 96 *S.Ct.* at 1621, 48 *L.Ed.*2d at 75–76. In an opinion authored by Justice Powell, the Supreme Court rejected defendant's argument that the records should be suppressed, finding that "there was no intrusion into any area in

which respondent had a protected Fourth Amendment interest." *Id.* at 440, 96 *S.Ct.* at 1622, 48 *L.Ed.*2d at 77.

Justice Powell explained that the Fourth Amendment protects against the "compulsory production of a man's private papers." *Ibid.* (quoting *Boyd v. United States,* 116 *U.S.* 616, 622, 6 *S.Ct.* 524, 528, 29 *L.Ed.* 746, 748 (1886)). However, he concluded that, "[o]n their face," the defendant's bank records were not his "private papers," *id.* at 440, 96 *S.Ct.* at 1623, 48 *L.Ed.*2d at 77, emphasizing that "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection," *id.* at 442, 96 *S.Ct.* at 1623, 48 *L.Ed.*2d at 78 (quoting *Katz v. United States,* 389 *U.S.* 347, 351, 88 *S.Ct.* 507, 511, 19 *L.Ed.*2d 576, 582 (1967)) (alteration in original). Justice Powell observed that checks, deposit slips, and the like "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business," *id.* at 442, 96 *S.Ct.* at 1624, 48 *L.Ed.*2d at 79, and further, that the defendant could "assert neither ownership nor possession. Instead, these are the records of the banks," *id.* at 440, 96 *S.Ct.* at 1623, 48 *L.Ed.*2d at 77. The Court held that, under the Federal Constitution, an individual has no "legitimate expectation of privacy" in bank records possessed by a bank, *id.* at 442, 96 *S.Ct.* at 1624, 48 *L.Ed.*2d at 79 (internal quotation marks omitted), and, thus, has no standing to challenge the federal government's acquisition of that individual's bank records, *id.* at 445, 96 *S.Ct.* at 1625, 48 *L.Ed.*2d at 80.

Four years later, the Court extended the reach of the *Miller* doctrine in *United States v. Payner,* 447 *U.S.* 727, 100 *S.Ct.* 2439, 65 *L.Ed.*2d 468 (1980). In *Payner,* IRS agents obtained the defendant's bank records by stealing them from a third-party's briefcase. *Id.* at 729–30, 100 *S.Ct.* at 2443, 65 *L.Ed.*2d at 472–73. Although recognizing that the Fourth Amendment did not provide a basis to suppress the records, the district court nonetheless exercised its supervisory authority to exclude evidence obtained by the government's "knowing and purposeful *bad faith hostility* to any person's fundamental constitutional rights." *Id.* at 731, 100

*S.Ct.* at 2444, 65 *L.Ed.*2d at 473 (quoting *United States v. Payner,* 434 *F.Supp.* 113, 136 (D.C.Ohio 1977)).

Justice Powell, again writing for the Court, held that the defendant did not have standing to challenge the admission of the records because he had " 'no protectable Fourth Amendment interest' in copies of checks and deposit slips retained by his bank." *Id.* at 732, 100 *S.Ct.* at 2444, 65 *L.Ed.*2d at 474 (quoting *Miller, supra,* 425 *U.S.* at 437, 96 *S.Ct.* at 1621, 48 *L.Ed.*2d at 75). Although it did not "condone the unconstitutional and possibly criminal behavior of those who planned and executed this 'brief-case caper,' " the Court repudiated the trial court's exercise of its supervisory authority. *Id.* at 733, 100 *S.Ct.* at 2445, 65 *L.Ed.*2d at 475. Justice Powell explained that the rigid application of an exclusionary rule "to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *Id.* at 734, 100 *S.Ct.* at 2444, 65 *L.Ed.*2d at 476.

As *Miller* and *Payner* make clear, the Federal Constitution does not recognize an expectation of privacy in bank records and does not give citizens recourse to challenge the federal government's acquisition of their bank records from their banks, even if that acquisition involves egregious misconduct. Therefore, the prosecution's procurement of defendant's bank records in this matter did not violate the United States Constitution.

### B.

In contrast to the development of federal law, our state jurisprudence has placed limits on the government's power to obtain bank records. As early as 1929, a New Jersey court recognized that account holders expect their banks to keep their records confidential, even in the face of a government official's formal request. *Brex v. Smith,* 104 *N.J. Eq.* 386, 146 *A.* 34 (Ch.1929). In *Brex,* a prosecutor demanded the bank records of all Newark police officers and their wives in order to, as he put it, "assist him in some investigation he [was] making." *Id.* at 387, 146 *A.* 34. In a prescient exploration of the significance of bank records, the

Chancery Court stated: "There is an implied obligation, as I see it, on the bank, *to keep these from scrutiny* until compelled by a court of competent jurisdiction to do otherwise. The information contained in the records *is certainly a property right." Id.* at 390, 146 *A.* 34 (emphasis added).

The court denied the prosecutor's request, instead directing the prosecutor to present his charges to a grand jury, which could subpoena the records as needed. *Id.* at 390–91, 146 *A.* 34. Otherwise, the court explained,

> *[t]he right to personal privacy would be gone,* and the public would lose confidence in the institutions to which they intrusted [sic] their assets. *I cannot think that the prosecutor has any such power, except as I have said in a specific case where a grand jury itself calls for such information.*
> [*Id.* at 392, 146 *A.* 34 (emphasis added).]

Four decades after *Brex,* we addressed the right of a defendant to challenge grand jury subpoenas duces tecum served on his bank and brokerage house in *In re Addonizio,* 53 *N.J.* 107, 248 *A.*2d 531 (1968). In *Addonizio,* a grand jury was convened to investigate allegations of governmental corruption in Newark against then-mayor Hugh J. Addonizio. *Id.* at 112, 248 *A.*2d 531. A prosecutor executed grand jury subpoenas duces tecum on Addonizio's financial institutions demanding that they provide their records of his transactions. *Id.* at 112–13, 248 *A.*2d 531. Addonizio asserted that his personal Fourth Amendment rights against unreasonable search and seizure extended to the records on file with his bank and broker. *Id.* at 131, 248 *A.*2d 531. Writing for the Court, Chief Justice Weintraub disagreed, concluding that the Fourth Amendment did not provide Addonizio with standing to challenge the subpoenas: "The subpoen[a]ed records are not his. This is true even though for some purposes the bank or the brokerage firm may be the 'agent' of Addonizio, for the bank and the brokerage firm are independent entrepreneurs and the records are entirely their property." *Ibid.*

Although *Addonizio* did not establish a constitutional right of privacy in bank records, the decision nonetheless implicitly recognized that a New Jersey citizen has an interest in maintaining

bank record confidentiality by distinguishing the circumstances in *Brex:* "There the prosecutor, *without any judicial process,* called upon banks to deliver the records of the accounts of policemen. The Court of Chancery restrained that action. *It is enough to say with respect to [Brex] that the opinion recognized a grand jury subpoena would be something else." Id.* at 134, 248 *A.*2d 531 (emphasis added) (citation omitted).

*Brex* and *Addonizio* represent a departure from federal juris- prudence. Under the Federal Constitution, as interpreted by *Miller* and *Payner,* the account holders could not have challenged the *Brex* prosecutor's acquisition of their bank records. *See Miller, supra,* 425 *U.S.* at 445, 96 *S.Ct.* at 1625, 48 *L.Ed.*2d at 80; *Payner, supra,* 447 *U.S.* at 732–34, 100 *S.Ct.* at 2444–45, 65 *L.Ed.*2d at 474–76. The *Brex* court, however, although grounding its decision in equity, rejected the argument that New Jersey prosecutors have unfettered power to obtain financial records held by third-party banks. *See* 104 *N.J. Eq.* at 390–91, 146 *A.* 34. Tellingly, the State concedes that *"Brex* remain[s] good law."

The State also acknowledges the distinction between *Miller* and *Addonizio:* *"Addonizio* predates *Miller* and is more restrictive than *Miller.* In [*McAllister*], the police followed *Addonizio,* not *Miller.* The State does not ask this Court to follow *Miller.* Rather it asks this Court to continue to follow the more restrictive holding of *Addonizio."* The "more restrictive holding" refers to *Addonizio's* endorsement of the *Brex* limitation placed on New Jersey governmental power to obtain bank records. *See Addoni- zio, supra,* 53 *N.J.* at 134, 248 *A.*2d 531. The State further explains: "In assessing bank records, it is important to note that the State does not suggest that police officers should be able to obtain bank records on demand."

In sum, although more implied than expressed, there are dis- tinctions between federal and New Jersey case law on the issue of bank record privacy, as the defendant asserts and as the State recognizes.

## IV.

In light of that divergence, this appeal requires us to address explicitly that which is implied in our case law-that is, the extent and scope of a New Jersey citizen's privacy interest in bank records. The Appellate Division held that article I, paragraph 7 of the New Jersey Constitution recognizes a citizen's reasonable expectation of privacy in his or her bank records, even when those records are in the possession of the bank. *McAllister, supra,* 366 *N.J.Super.* at 267–68, 840 *A.*2d 967. We agree.

### A.

Although sensitive to the fact that difficulties can arise when state law deviates from federal law, we are equally aware that our state courts may create "an independent body of state constitutional law." *State v. Hunt,* 91 *N.J.* 338, 362–63, 450 *A.*2d 952 (1982) (Handler, J., concurring). Indeed, "[w]hen the United States Constitution affords our citizens less protection than does the New Jersey Constitution, we have not merely the authority to give full effect to the State protection, we have the duty to do so." *State v. Hempele,* 120 *N.J.* 182, 196, 576 *A.*2d 793 (1990).

In nearly identical provisions, the Federal and New Jersey Constitutions both protect citizens from "unreasonable searches and seizures" by government authorities. *Compare U.S. Const.* amend. VI *with N.J. Const.* art. I, ¶ 7. Despite the similar language, we have recognized that our Constitution "affords our citizens greater protection against unreasonable searches and seizures" than its federal counterpart. *State v. Novembrino,* 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987). For example, in *Novembrino,* we held that our Constitution, unlike the Federal Constitution, does not afford law enforcement a "good faith" exception to the exclusionary rule. *Id.* at 158, 519 *A.*2d 820. Likewise, in *State v. Alston,* we determined that a person's standing to challenge search and seizure violations is broader under our state charter. 88 *N.J.* 211, 225–28, 440 *A.*2d 1311 (1981).

Although cognizant that the Fourth Amendment does not prevent government intrusion into that which "a person knowingly exposes to the public," *see Miller, supra,* 425 *U.S.* at 442, 96 *S.Ct.* at 1623, 48 *L.Ed.*2d at 78, we nonetheless, on two prior occasions, have found that our Constitution provides a measure of additional protection. In *Hunt, supra,* we held that citizens had a protectable interest in their long distance phone records even though those records were in possession of the telephone company. 91 *N.J.* at 348, 450 *A.*2d 952. We rejected the premise that a phone customers reasonable expectation of privacy extended only to the phone conversation itself:

> It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons.
>
> [*Id.* at 347, 450 *A.*2d 952.]

And, in *Hempele, supra,* we found a reasonable expectation of privacy in garbage left for collection in an opaque container. 120 *N.J.* at 203, 576 *A.*2d 793. As with phone records, the mere possibility that an outsider might gain access to curbside garbage did not defeat a reasonable expectation of privacy "because a person can maintain a privacy interest in something that is not completely vulnerable to prying eyes." *Id.* at 204, 576 *A.*2d 793.

### B.

Bank records, like long distance billing records, differ from other documents that memorialize an individual's affairs. On their face, bank records are simply a collection of numbers, symbols, dates, and tables. They are a veritable chronicle of the mundane: the payment of a nominal ATM fee, the automatic deposit of a paycheck, the monthly interest earned on a savings account. However, when compiled and indexed, individually trivial transactions take on a far greater significance. "In the course of such dealings, a depositor reveals many aspects of his personal affairs,

opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography." *Burrows v. Superior Court*, 13 *Cal.*3d 238, 118 *Cal.Rptr.* 166, 529 *P.*2d 590, 596 (1975).

Common experience instructs us that when a citizen retains money at home and conducts financial transactions without the use of an intermediary, he or she understands that the government cannot obtain records of those transactions without adequate process—i.e., a subpoena that carries a concomitant opportunity to make a motion to quash. But, in contemporary society, it is the rare citizen who "socks away" cash in the proverbial mattress. Instead, citizens customarily deposit money in bank accounts, which have become an indispensable part of modern commerce. As a consequence, numerous participants in our nation's economic life leave behind detailed financial dossiers. *See ibid.*

To be sure, bank customers voluntarily provide their information to banks, but they do so with the understanding that it will remain confidential. "A bank customer may not care that employees of the bank know a lot about his financial affairs, but it does not follow that he is indifferent to having those affairs broadcast to the world or disclosed to the government." Richard Posner, *The Economics of Justice* 342 (1981); *see also Charnes v. DiGiacomo*, 200 *Colo.* 94, 612 *P.*2d 1117, 1121 (1980) ("[T]he inadvertent disclosure of information about the substance of financial transactions was incidental to the customer's major purpose of facilitating fund transfers."). We do not subscribe to the view that a person who entrusts funds to a bank should lose all of the protections that would have accrued if the money was left at home.

Technological advances enhance the government's capability to gain access to a person's bank records. As Justice Mosk observed in *Burrows, supra,* "[d]evelopment of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds." 118 *Cal.Rptr.* 166, 529 *P.*2d at 596. Considering the

array of technology currently at the government's disposal, that observation is even more apt today than it was three decades ago.

## C.

Although some state courts have agreed with the Supreme Court's conclusion that citizens have no reasonable expectation of privacy in bank records, *see, e.g., State v. Klattenhoff,* 71 *Haw.* 598, 801 *P.*2d 548, 552 (1990); *State v. Schultz,* 252 *Kan.* 819, 850 *P.*2d 818, 819–36 (1993), other states have diverged from *Miller* and concluded, as a matter of their state constitutions or legislative enactment, that bank customers have a protectable expectation that their bank records will remain private, *see, e.g., Burrows, supra,* 118 *Cal.Rptr.* 166, 529 *P.*2d at 596; *Charnes, supra,* 612 *P.*2d at 1121; *Winfield v. Div. of Pari–Mutuel Wagering,* 477 *So.*2d 544, 546–48 (Fla.1985); *Commonwealth v. DeJohn,* 486 *Pa.* 32, 403 *A.*2d 1283, 1291 (1979); *People v. Jackson,* 116 *Ill.App.*3d 430, 72 *Ill.Dec.* 153, 452 *N.E.*2d 85, 88–90 (1983). The Federal Government also has enacted legislation that provides for a privacy right in bank records. *See* Right to Financial Privacy Act, 12 *U.S.C.A.* §§ 3401 to 3422. Those jurisdictions, either explicitly or implicitly, draw on the public policy that "[t]he confidential relationships between financial institutions and their customers are built on trust." *Cal. Gov.Code* § 7461(c).

## D.

We also acknowledge that account holders repose trust and confidence in their banks, a relationship that is eroded by unwarranted government interference. This recognition reflects the long tradition in New Jersey of limiting government access to bank records. Further, the advent of modern technology, coupled with the ubiquity of commercial banking, underscores both the ability of prying government eyes to obtain bank records and the need to protect ordinary citizens' financial privacy in ways that promote fairness. Accordingly, we hold that the New Jersey

Constitution recognizes an account holder's interest in the privacy of his or her bank records.

## V.

Although we conclude that New Jersey citizens have a reasonable expectation of privacy in their bank records, circumstances will arise that justify State intrusion upon that interest. The core remaining question, then, is the measure of protection that we should afford a person's privacy interest in bank records in view of law enforcement's legitimate investigatory needs.

We first consider which standard shall govern the issuance of grand jury subpoenas for bank records—probable cause or relevance to the subject matter of the investigation. The Appellate Division accepted defendant's argument that the State must demonstrate probable cause to obtain a grand jury subpoena duces tecum for bank records. *McAllister, supra,* 366 *N.J.Super.* at 254, 840 *A.*2d 967. The State asserts that relevance is sufficient. We agree with the State's position and uphold the relevancy standard.

### A.

We return to *Addonizio, supra,* 53 *N.J.* 107, 248 *A.*2d 531, in which this Court addressed the grand jury subpoena standard. In addition to the subpoenas served on his bank and broker, the prosecutor issued a grand jury subpoena duces tecum on Addonizio himself, demanding that he produce financial documents in his own possession, including statements, deposit slips, and cancelled checks. *Id.* at 113, 248 *A.*2d 531. Addonizio asserted that a grand jury "should be required to show some basis or probable cause" before requesting his personal records. *Id.* at 123, 248 *A.*2d 531 (internal quotation marks omitted).

The Court disagreed, explaining that grand juries have never been bound only to investigate charges that were already supported by probable cause. *Id.* at 124, 248 *A.*2d 531. Chief Justice Weintraub observed that "the *probable cause required for a*

*search warrant is foreign to this scene* .... [A grand jury's] power to investigate would be feeble indeed if [it] had to know at the outset everything needed to arrest a man or to invade his home." *Id.* at 126, 248 *A.*2d 531 (emphasis added). Although a grand jury's investigative power is not entirely without limits,

> very little [justification] must suffice if the grand jury is to function. It may explore an anonymous charge. So, also, a rumor. Indeed, it may be urgent that a rumor be pursued, to relieve the public of the evil if the rumor is true and the burden of the rumor if it is false.
>
> [*Ibid.*]

In reaching that conclusion, the Court grounded its analysis in the Federal Constitution. *Id.* at 124, 248 *A.*2d 531. The Court suggested, however, that provisions of both the Federal and State Constitutions are coterminous: "We need not consider whether the grand jury's authority is wholly a matter of local law unrestrained by the Federal Constitution, for the federal view of a grand jury's power in criminal matters seems as broad as our own." *Ibid.*

Since this Court decided *Addonizio*, New Jersey courts have consistently affirmed the expansive investigatory power of grand juries. Two opinions of the Appellate Division have set forth the prevailing standard that a court should apply when considering a motion to quash a grand jury subpoena. In *In re Grand Jury Subpoena Duces Tecum,* the court held that when the recipient of a grand jury subpoena challenges its validity, the State need only establish "(1) the existence of a grand jury investigation and (2) the nature and subject matter of the investigation." 167 *N.J.Super.* 471, 472, 401 *A.*2d 258 (App.Div.1979) (per curiam). In other words, the documents under subpoena must "bear some possible relationship, however indirect, to the grand jury investigation." *Id.* at 473, 401 *A.*2d 258 (internal quotation marks omitted). The prosecutor need not present formal proofs, but may establish relevancy on the prosecutor's representations. *Id.* at 472, 401 *A.*2d 258. Two years later, in *State v. Hilltop Private Nursing Home, Inc.,* the court explained that a grand jury does not have to initiate the subpoena process because the prosecutor "must be

given leeway in marshaling evidence before a grand jury." 177 *N.J.Super.* 377, 389, 426 *A.*2d 1041 (App.Div.1981). Therefore, the prosecutor can issue subpoenas in the name of a grand jury so long as they are returnable on a date when the grand jury is in session, subject, of course, to the standard of relevance. *Id.* at 396, 426 *A.*2d 1041.

### B.

As noted, the Appellate Division in this matter concluded that a finding of probable cause is constitutionally required to support a grand jury subpoena duces tecum for an individual's bank records. *McAllister, supra,* 366 *N.J.Super.* at 267–68, 840 *A.*2d 967. In reaching that conclusion, the panel relied on *Burrows, supra,* 118 *Cal.Rptr.* 166, 529 *P.*2d at 599; *Cal. Gov.Code* § 7476(b)(1); and *People v. Mason,* 989 *P.*2d 757, 759–60 (Colo.1999). However, those authorities do not premise the issuance of a grand jury subpoena on a finding of probable cause.

In *Burrows, supra,* the Supreme Court of California, applying the California Constitution, found a reasonable expectation of privacy in bank records. 118 *Cal.Rptr.* 166, 529 *P.*2d at 593. But, the court explained, a "subpoena issued . . . by a court in the context of a criminal proceeding" overcomes that expectation. *Id.* at 166, 529 P.2d at 594 (citation omitted). Nowhere in *Burrows* did the court require a finding of probable cause before a subpoena for bank records could issue. Likewise, the California statute cited by the Appellate Division does not mandate a probable cause standard. *Cal. Gov.Code* § 7476(b)(1) permits the government to use a grand jury subpoena duces tecum to obtain bank records by showing that the commission of a crime can be "reasonabl[y] infer[red]" and that the records are "reasonably necessary" to the investigation.

The Appellate Division's conclusion is also unsupported by *Mason, supra,* where the Colorado Supreme Court held that a trial subpoena must be predicated on probable cause, *989 P.*2d at

760–61, but unambiguously exempted grand jury subpoenas duces tecum from that requirement: "Today's ruling does not undermine our previous statements that a probable cause determination is not required for ... a grand jury [subpoena]...." *Id.* at 761.

The Appellate Division also relied on our decisions in *Hunt* and *Hempele*. *McAllister, supra,* 366 *N.J.Super.* at 263–68, 840 *A.*2d 967. However, because *Hunt* and *Hempele* did not involve grand jury subpoenas duces tecum, neither of those opinions requires a different result in this appeal.

## C.

Our Constitution protects against government's unreasonable searches and seizures. *N.J. Const.* art. 1, ¶ 7. In the specific setting of this appeal—i.e., when the government seeks bank records on file with a bank—we hold that the issuance of a grand jury subpoena duces tecum based on a relevancy standard satisfies the constitutional prohibition against improper government intrusion. Under that standard, "the grand jury remains a constitutional bulwark against hasty and ill-founded prosecutions and continues to lend legitimacy to our system of justice by infusing it with a democratic ethos." *State v. Fortin,* 178 *N.J.* 540, 638, 843 *A.*2d 974 (2004). Accordingly, we reaffirm *Addonizio* and reverse that portion of the Appellate Division's opinion that requires the State to make an affirmative showing of probable cause in support of a grand jury subpoena duces tecum.[1]

---

[1] No question has been raised in this case in respect of administrative subpoenas duces tecum. We observe, however, that *Addonizio, supra,* discusses with approval the use of administrative subpoenas by executive branch agencies. 53 *N.J.* at 121–23, 248 *A.*2d 531; *see Mason, supra,* 989 *P.*2d at 762 ("The same reasonableness requirements [that govern grand jury subpoenas] apply even to an administrative subpoena of constitutionally protected material."). An administrative subpoena duces tecum for bank records is valid under the New Jersey Constitution so long as "its purpose is legitimate under statute, the inquiry is relevant to that purpose, and ... the required administrative steps have been duly followed." *In re Doe,* 294 *N.J.Super.* 108, 119–20, 682 *A.*2d 753 (Law Div.1996) (citing *Okla. Press Publ'g Co. v. Walling,* 327 *U.S.* 186, 66 *S.Ct.* 494, 90

## VI.

Both the Appellate Division and defendant maintain that the New Jersey Constitution requires the State to give an individual who is under grand jury investigation notice and an opportunity to protest the government's acquisition of that individual's bank records. Then, if necessary, a neutral judiciary can review claims of arbitrary and oppressive State action.

Although we conclude that notice is not constitutionally mandated, we believe that further study is warranted to assess whether a notice requirement reflects good policy. Therefore, we refer this matter to the Criminal Practice Committee, and, in order to provide guidance, we make the following observations.

### A.

We first consider the potential merits of a notice requirement. A grand jury subpoena duces tecum compels the production of documents by persons or entities. The execution of the subpoena gives notice to the recipient that those documents are required as part of a grand jury investigation. The recipient, who must provide the documents, has a right to make a motion to quash the subpoena for a variety of procedural or substantive inadequacies. *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 143 *N.J.Super.* 526, 363 *A.*2d 936 (Law Div.1976). Thus, had the State served defendant with a grand jury subpoena demanding that she herself provide copies of her personal records, she would have had both notice of the State's efforts and standing to object on the ground that compelling her to do so would violate her Fifth Amendment right against self-incrimination. *See, e.g., Addonizio, supra,* 53 *N.J.* at 129, 248 *A.*2d 531; *Schmerber v. California,* 384 *U.S.* 757,

L.Ed. 614 (1946)), *aff'd,* 302 *N.J.Super.* 255, 695 A.2d 319 (App.Div.), *certif. denied,* 151 *N.J.* 468, 700 A.2d 880 (1997), *cert. denied,* 523 *U.S.* 1096, 118 *S.Ct.* 1580, 140 *L.Ed.*2d 795 (1998); *accord Winfield v. Div. of Pari–Mutuel Wagering,* 477 *So.*2d 544, 548 (Fla.1985) (holding that administrative subpoena for bank records sufficiently protected account holder's state constitutional privacy interest).

763–65, 86 *S.Ct.* 1826, 1831–33, 16 *L.Ed.*2d 908, 916–17 (1966). Indeed, in *Addonizio, supra,* Addonizio protested the subpoena he personally received from the State on Fifth Amendment grounds, and, because he was the target of the investigation, he prevailed. 53 *N.J.* at 129, 248 *A.2d* 531.

A problem arises, however, when the prosecutor executes a grand jury subpoena duces tecum on a third party, such as a bank. Although the bank can oppose the subpoena on the same procedural grounds as any other party under subpoena, the bank does not have available the arsenal of substantive arguments that the investigation's target could advance. Furthermore, as a practical matter, the bank simply does not have the same incentive to vigorously assert even its limited defenses against the State's request. Banks understandably "have an independent interest in voluntarily cooperating with law enforcement officers because financial institutions desire to foster a favorable public image, and like any good citizen, to assist in the detection of crime." *Burrows, supra,* 118 *Cal.Rptr.* 166, 529 *P.2d* at 593.

### B.

There may be much to commend a system that provides notice to the account holder and an opportunity to protect his or her interest in keeping bank records confidential. However, despite all good intentions, a procedure that is intended to safeguard individuals from governmental excess just as easily can harm society and its citizens when that procedure is applied mechanically. Simply stated, because providing notice to every account holder whose bank records are subpoenaed may unduly impair the grand jury's ability to investigate, the legitimate needs of law enforcement warrant a workable and practical exception.

Investigations frequently call for government examination of bank records. For example, the State instances money laundering, a crime in which a financial transaction itself constitutes the offense. *See N.J.S.A.* 2C:21–25e(3) (prohibiting structuring of transactions with financial institutions to evade reporting require-

ments). Bank records may be the only indication that money was laundered. Likewise, investigations into government corruption may be adversely affected unless authorities are able to identify the parties to illegal transactions through their bank records. *See Addonizio, supra,* 53 *N.J.* at 135, 248 *A.*2d 531 ("This kind of probing is peculiarly needed to uncover corruption in office. Such offenses are covertly committed."). Other examples, including identity theft and insurance fraud, often involve the shifting of money and other illicit dealings that are documented by bank records. *See, e.g., N.J.S.A.* 2C:21–17 (criminalizing impersonation of another person to obtain benefit by fraud). Finally, bank transfers can reveal the funding of terrorist activity. *See* Eric Lichtblau, *U.S. Seeks Access to Bank Records to Deter Terror, N.Y. Times,* April 9, 2005, *available at* 2005 *WLNR* 5598007 (quoting former 9/11 Commission member: "The idea is for the government to make it more difficult and more risky for terrorists to move money. . . .").

Crimes involving corruption and fraud depend on secrecy and misinformation. Those who commit them, when confronted, hide behind walls of silence, making detection difficult. *See Addonizio, supra,* 53 *N.J.* at 135, 248 *A.*2d 531 (recognizing that "a direct inquiry" of offender "is not likely to be productive"); *United States v. Alexandro,* 675 *F.*2d 34, 43 (2d Cir.) (acknowledging need for "special investigative techniques to uncover insidious corruption"), *cert. denied,* 459 *U.S.* 835, 103 *S.Ct.* 78, 74 *L.Ed.*2d 75 (1982). The State's inability to investigate and prosecute such offenses corrodes the public's faith in its government. Furthermore, the same technology that raises Orwellian concerns of governmental heavy-handedness also enables criminals to conduct clandestine financial transactions quickly and easily. *Cf. Alexandro, supra,* 675 *F.*2d at 43 ("Modern crime fighting methods . . . often are the only means of discovering breaches of the fundamental mandate of one's office.").

Providing notice to account holders that their bank records are part of an investigation may encourage some unscrupulous individ-

uals to drain the account, flee the jurisdiction, or otherwise frustrate the investigation. *See Addonizio, supra,* 53 *N.J.* at 126, 248 *A.*2d 531 (observing that requiring grand jury to reveal "what it has or what it seeks" could "defeat the inquiry and impede the apprehension of the culprit"). Indeed, the State predicts that defense counsel, when apprised that a client's bank records are subpoenaed, will make a motion to quash simply to obtain discovery. A notice requirement may also undermine the secrecy that is traditionally provided to grand jury investigations. *See id.* at 134, 248 *A.*2d 531 (acknowledging that individual "may be hurt" by overreaching grand jury investigation, but indicating that "secrecy of the grand jury is to minimize the possibility of such injury"); *H.R. Report 95–1383* (1978), *reprinted in* 1978 *U.S.C.C.A.N.* 9273, 9358 ("Expanded notice and challenge rights might diminish grand jury secrecy and threaten the privacy of individuals being investigated.").

### C.

This dilemma is not unique to our State. Several states that have found that citizens have a privacy interest in bank records have nonetheless determined that a notice requirement is not required because ordinary subpoena procedures adequately protect that right. *See, e.g., Winfield v. Div. of Pari–Mutuel Wagering, supra,* 477 *So.*2d at 548. Other jurisdictions, however, have determined that before governmental authorities acquire bank records, they must provide the account holder with notice and an opportunity to object. Every set of procedures permits government to forgo giving notice under certain circumstances. The experience from those jurisdictions is instructive.

After a series of decisions by the California Supreme Court, the California Legislature passed financial privacy legislation to establish notice procedures. As a general rule, the law requires the prosecutor to inform an account holder that his or her records are under grand jury investigation. *Cal. Gov.Code* § 7476(b)(1)(A); *see also Bd. of Med. Quality Assurance v. Gherardini,* 93 *Cal.*

*App.*3d 669, 156 *Cal.Rptr.* 55, 62 (1979) (recognizing "the right of a grand jury to so investigate within its lawful sphere," but nevertheless requiring notice to account holder before service of grand jury subpoena on bank). The California process allows a prosecutor to delay giving notice for thirty days upon a showing that notice would "impede the investigation by the grand jury." *Cal. Gov.Code* § 7476(b)(1)(C)

Connecticut law also requires the State to provide notice when it issues a subpoena, warrant, or court order to examine bank records. *See Conn. Gen.Stat. Ann.* § 36a–43(a). The notice requirement "was enacted to afford a bank customer the opportunity to contest the validity of those inquiries about his bank records." *Morgan v. Brown,* 219 *Conn.* 204, 592 *A.*2d 925, 930 (1991). Notice to the account holder can be waived if the State can demonstrate "good cause" for doing so. *Conn. Gen.Stat. Ann.* § 36a–43(a).

Federal legislation provides some protection for bank records. In 1978, Congress enacted the Right to Financial Privacy Act (RFPA), 12 *U.S.C.A.* §§ 3401 to 3422, a direct response to the Supreme Court's decision in *Miller:* "[W]hile the Supreme Court found no constitutional right of privacy in financial records, it is clear that Congress may provide protection of individual rights beyond that afforded in the Constitution." *H.R.Rep. No. 95–1383, supra, reprinted in* 1978 *U.S.C.C.A.N.* at 9306. The RFPA requires that an account holder be notified if the government issues a warrant, certain subpoenas, or a formal written request for that person's bank records from his or her bank. 12 *U.S.C.A.* § 3407(2). The law also sets forth a procedure by which the government can avoid giving notice if, for example, notice would result in "flight from prosecution," "intimidation of potential witnesses," and other serious impediments to the investigation. *Id.* § 3409. Congress intended this combination of notice and exceptions to "protect the customers of financial institutions from unwarranted intrusion into their records while at the same time permitting legitimate law enforcement activity." *H.R.Rep. No.*

*95–1383, supra, reprinted in* 1978 *U.S.C.C.A.N.* at 9306. Significantly, the RFPA specifically exempts grand jury subpoenas from its notice requirement. 12 *U.S.C.A.* § 3413(i); *see also H.R.Rep. No. 95–1383, supra, reprinted in* 1978 *U.S.C.C.A.N.* at 9306 ("Since the grand jury operated under scrutiny, grand jury subpoenas are less subject to abuse than other forms of process.").

### D.

Our grand jury process—bounded by relevancy and safeguarded by secrecy—conforms to our jurisprudence. *See Addonizio, supra,* 53 *N.J.* at 126–28, 134, 248 *A.2d* 531. The New Jersey Constitution does not require more. However, a system requiring notice, and yet providing for circumstances where notice is excused, may strike a more desirable balance between the privacy interest in bank records and the legitimate investigatory needs of the State.

By way of analogy, in *State v. Cook,* although we determined that electronic recordation of defendant confessions was not compelled by due process, we nonetheless recognized that creating recordings might benefit both defendants and investigators by making confessions more reliable, but also that the practice could be burdensome to administer. 179 *N.J.* 533, 559–62, 847 *A.2d* 530 (2004). We observed that

> [t]hose considerations are important and nuanced, and should be addressed in a context broader than that permitted in any one criminal appeal. The balancing of interests will require careful and deliberate study.... We believe that the criminal justice system will be well served if our supervisory authority is brought to bear on this issue and we will exercise that authority mindful of the various interests involved.
>
> [*Id.* at 562, 847 *A.2d* 530.]

As a result, we established "a committee to study and make recommendations" on the use of electronic recordation of custodial interrogations. *Ibid.*

In this matter, we exercise our supervisory authority over grand juries to refer this issue to the Criminal Practice Committee for further study of the benefits and burdens of enhanced protections

for bank records. *See N.J.S.A.* 2B:22–2b (authorizing Court to promulgate grand jury rules and regulations); *N.J.S.A.* 2B:22–5 (empowering Chief Justice to designate judge to supervise grand jury process); *see also State v. Murphy,* 110 *N.J.* 20, 31–33, 538 *A.*2d 1235 (1988) (recognizing explicit and implicit oversight role of judiciary over grand juries). The Committee, which includes experienced professionals drawn from both the prosecution and defense bar, may make recommendations to the Court concerning the need, if any, for additional grand jury procedures. We then will be able to engage in a more informed balancing of the competing interests that will promote "logic and fairness" in our grand jury system. *See Fortin, supra,* 178 *N.J.* at 646, 843 *A.*2d 974.

## VII.

For the foregoing reasons, we affirm in part, reverse in part, and affirm defendant's conviction.

Justice WALLACE, concurring in the result.

The singular issue in this case is whether the State's acquisition of defendant's bank records by grand jury subpoena was defective because it was not based on probable cause. In rejecting a probable cause requirement in *In re Addonizio,* Chief Justice Weintraub, writing for the Court, declared that "the 'probable cause' required for a search warrant is foreign to [the grand jury] scene." *Supra,* 53 *N.J.* at 126, 248 *A.*2d 531. Chief Justice Weintraub explained that the grand juries'

> power to investigate would be feeble indeed if the grand jury had to know at the outset everything needed to arrest a man or to invade his home. Nor would it serve the public interest to stay a probe until the grand jury reveals what it has or what it seeks. Such disclosures could defeat the inquiry and impede the apprehension of the culprit. This is one of the reasons why the law cloaks the grand jury investigation with secrecy.
>
> [*Ibid.*]

The *Addonizio* Court held that "the requirement is 'that the subpoena be sufficiently limited in scope, relevant in purpose, and

specific in directive so that compliance will not be unreasonably burdensome.' " *Id.* at 128, 248 *A.*2d 531. The majority cites *Addonizio* approvingly, agrees that relevancy is the standard for a grand jury subpoena of bank records, and finds that requirement was satisfied here. I concur in that conclusion.

However, in deciding this case, it is not necessary to make a constitutional pronouncement that we have a protected reasonable expectation of privacy in bank records. We have stated on numerous occasions that " 'a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of [the] litigation.' " *Bell v. Stafford Tp.,* 110 *N.J.* 384, 389, 541 *A.*2d 692 (1988) (quoting *Donadio v. Cunningham,* 58 *N.J.* 309, 325–326, 277 *A.*2d 375, (1971)); citing *Ahto v. Weaver,* 39 *N.J.* 418, 428, 189 *A.*2d 27 (1963); *State v. Salerno,* 27 *N.J.* 289, 296, 142 *A.*2d 636 (1958) and *American Bank & Trust Co. of Pennsylvania v. Lott,* 193 *N.J.Super.* 516, 521, 475 *A.*2d 73 (App.Div.1984), *aff'd,* 99 *N.J.* 32, 490 *A.*2d 308 (1985).

Justice Clifford essentially expressed my view when he emphasized that "there is the sound, oft-expressed principle that constitutional questions should not be reached and resolved unless absolutely imperative in the disposition of the litigation." *State v. Saunders,* 75 *N.J.* 200, 229, 381 *A.*2d 333 (1977) (Clifford, J., dissenting) (citations omitted). Justice Clifford stressed that "[w]hile the adjudicative process admits of few unyielding rules, this maxim comes as close as any to being an absolute." *Ibid.* Inasmuch as we all agree that the relevancy standard for the grand jury subpoena for defendant's bank records was met here, we should defer addressing the constitutional issue.

Justices LaVECCHIA and RIVERA–SOTO join in this opinion.

*For affirmance in part/reversal in part*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.