# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2209-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KELVIN BRIGGS, a/k/a
KEVIN BRIGGS, ROBERT
DORSEY, and KELVIN KIRBY,

    Defendant-Appellant.

_____

Submitted May 6, 2024 – Decided March 12, 2025

Before Judges DeAlmeida, Berdote Byrne, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 18-08-0647.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Austin J. Howard, Assistant Deputy Public Defender, of counsel and on the briefs).

Robert J. Carroll, Morris County Prosecutor, attorney for respondent (Robert J. Lombardo, Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant Kelvin Briggs appeals from the February 16, 2022 judgment of conviction (JOC) entered after a jury found him guilty of seven criminal offenses arising from, among other things, his electronic exchange of sexually explicit conversations, sexually explicit photos, and a pornographic video with a thirteen-year-old girl, and his electronic transmission of some of the photos to a teacher at the girl's middle school. Defendant's convictions included stalking, N.J.S.A. 2C:12-10(b), for sending what the State alleged were threatening text messages to the victim.

We affirm defendant's convictions, except his conviction for stalking, which we reverse. Under the holdings in Counterman v. Colorado, 600 U.S. 66 (2023), issued during the parties' briefing of this appeal, and State v. Fair, 256 N.J. 213 (2024), issued after briefing was completed, defendant's stalking conviction violated the First Amendment because the jury was not required to find beyond a reasonable doubt defendant had an objective understanding of the threatening nature of his text messages and the minimum mens rea of recklessness that the text messages would be viewed as threatening violence.

A-2209-21

Defendant also appeals the sentence he received for his convictions. We affirm his sentence, except for the time-served sentence imposed for his stalking conviction, which we vacate. We remand to the trial court for retrial of the stalking charge and to correct an omission in the JOC.

I.

On November 16, 2017, E.G. saw her friend K.Q., a thirteen-year-old student at a New Jersey middle school, during lunch time, crying, gripping her cell phone tightly, and looking down at her phone.[1] K.Q. told E.G. she was texting a guy and was afraid. E.G. reported K.Q.'s behavior to a school counselor. The counselor met with K.Q., who did not disclose sexual abuse.

Also in November 2017, K.M., another friend of K.Q., received threatening and aggressive phone calls from a person looking for K.Q.'s sister. The calls came from a phone number starting with 702-815. K.M. had never previously received a phone call from the 702 area code, which is assigned to Las Vegas, Nevada. The caller left a voicemail on K.M.'s phone, which was played for the jury: "I need you to respond. You need to answer me, [K.]. I'm not kiddin'. Don't ignore me right now. Pick me up."

---

[1] We identify the victim and others by initials to protect the confidentiality of court records relating to child victims of sexual assault. R. 1:38-3(c)(9).

A-2209-21

K.Q. participated in the school band. L.K., the band director at K.Q.'s school and one of her teachers, had a work email address available on the school's public websites. On November 27, 2017, L.K. received an email at her work email address from a sender identified as Kelvin Kirby at kkirb500@gmail.com. The email's subject line was "[K.Q.] [school name] band slut" or something similar. Attached to the email were photos of K.Q., two of which showed her topless and in underwear, as well as a screen shot of a text message exchange with K.Q. L.K. was unfamiliar with Kelvin Kirby and had never previously received a message from kkirb500@gmail.com. L.K. immediately reported the email to a school administrator who contacted police.

A detective interviewed K.Q., who gave him the telephone number of a person with whom she had recently been communicating. The number, which began with 702-815, was the same number associated with the calls to K.Q.'s friend. K.Q. met the person she was communicating with in the summer of 2017 on MyLOL, a teen chat site. She believed him to be a nineteen-year-old named Kelvin Kirby who lived in Las Vegas. The State alleged Kirby was defendant, a sixty-year-old felon who lived in Las Vegas.

K.Q. gave defendant her phone number and they began communicating via text message and telephone. Defendant sent K.Q. what he identified as a

photograph of himself, depicting a young male. K.Q., who called defendant by the nickname "daddy," transmitted photos of herself to defendant at his request. The State entered into evidence twenty-five photos of K.Q. she sent to defendant. She testified she sent additional photos of her unclothed with her private parts exposed to defendant at his request. K.Q. testified she believed "something bad would happen" if she did not send the photos. K.Q. also testified that at defendant's request, she recorded and sent to him videos of herself naked. In addition, K.Q. followed defendant's instructions to record herself naked while penetrating her vagina with her fingers and to transmit that video to him.

K.Q. stated her "relationship" with defendant "turned bad" once she started to date a sixteen-year-old boy. When K.Q. told defendant about her boyfriend, he threatened to appear at her home. Defendant texted K.Q.'s home address to her, despite K.Q. having never told defendant where she lived. He also sent her screen shots of her home and school, and a photo of an airline ticket from Las Vegas to Newark. K.Q. was afraid defendant would appear at her home and ruin her life. K.Q. never met the individual with whom she was communicating in person.

K.Q.'s mother told the detective she received concerning recorded messages on her answering machine. The detective went to K.Q.'s home and

A-2209-21

recorded the messages. The messages asked for a call back at the 702-815 phone number reported by K.Q.

On November 17, 2017, the detective issued an emergency disclosure request to TextNow, Inc., the Internet Service Provider (ISP) for the 702-815 phone number. He requested the customer's name, email address, and recent Internet Protocol (IP) addresses generated when the phone number was used to contact a computer network during the period November 15, 2017, to November 17, 2017. IP addresses are a unique digital number assigned to a device connected to a computer network that uses the Internet Protocol for communication. An IP address serves two main functions: network interface identification and location addressing.

That same day, the detective received from TextNow, Inc. subscriber information identifying defendant as the subscriber associated with the phone number and an IP address log for the requested period. The log listed five IP addresses generated when the phone number accessed a computer network during the three days identified in the information request. Subsequent subpoenas to the ISPs of the IP addresses of the computer networks to which the phone number connected revealed the phone number contacted publicly

6

available wireless computer networks at five casinos in Las Vegas, including Bally's Hotel and Casino (Bally's) and Platinum Hotel.

Put simply, through issuance of the warrantless subpoenas, the detective determined defendant was the subscriber of the phone number identified by K.Q. and that the phone number accessed the Internet over public wireless networks at five Las Vegas casinos during a three-day period when K.Q. was communicating with someone using that phone number.

On November 28, 2018, the State issued a grand jury subpoena to Google for subscriber information and an IP address history log for the period August 1, 2017, to November 27, 2017, related to kkirb500@gmail.com. Google reported the name of the subscriber associated with the email was Kelvin Kirby, who listed Kbriggs500@gmail.com as the recovery email address. In response to a grand jury subpoena, Google reported Kbriggs500@gmail.com belonged to defendant and was associated with the same phone number reported by K.Q., as well as with a MyLOL chat user. The IP addresses generated by those email accounts during the period indicated use of computer networks at Bally's and Platinum Hotel. It was determined the IP address associated with the email sent to L.K. was the computer network at Bally's.

7

The detective reviewed a phone extraction from K.Q.'s phone. He found several phone calls from the 702-815 number to K.Q.'s phone and a Facetime call from KB5000@icloud.com. The detective found 1,356 text messages relevant to the investigation, all of which had been deleted, but were recovered through the Cellebrite application. The messages were sent during the period October 22, 2017, to November 16, 2017.

Among the text messages found on K.Q.'s phone from defendant were: "[K.Q.'s grandmother's first name], know her? Both are going to know me before the day is over. I f---ing guaranty you;" "OMG. Before school is out today, you going to wish you were never born;" and "so just keep texting your boyfriend[] . . . all the rest, but if it's the last thing I ever do, you're going to pay for what you did." Another text exchange between defendant and K.Q. stated:

> Incoming: [K.], let me tell your dumb ass something, okay?
>
> Outgoing: Okay.
>
> Incoming: I know every f---ing thing you ever said to me is a f---ing lie.
>
> Incoming: Trust me, I got phone numbers, e-mails, addresses, work places (sic).

The detective reviewed photos recovered from K.Q.'s phone, extracting thirteen. On K.Q.'s laptop, the detective recovered six videos from the recycling

8

bin. The longest of the videos depicted K.Q. removing her top, exposing her breasts, removing her underwear, and digitally penetrating herself.

The detective determined defendant was detained at the Clark County Correctional Facility in Las Vegas on unrelated charges. On February 8, 2018, two officers attempted to interview defendant at that facility. Before being read his Miranda[2] warnings, defendant declined to answer questions without his attorney present.

While in Las Vegas, the officers obtained possession of defendant's cell phone, which had been seized by the Las Vegas Metro Police Department. The officers searched the phone and discovered the text messages between K.Q. and defendant previously found on K.Q.'s phone matched text messages on defendant's phone. The officers found twenty-eight calls between defendant and K.Q., twenty calls to K.Q.'s grandmother's number, and messages on Google HangOuts to K.Q. between October 24, 2017, and November 25, 2017. Defendant also had two emails on his phone from peoplelooker.com asking if he still wanted a report on K.Q.'s mother.

Additionally, the detective discovered 368 web searches about K.Q., her mother, her grandmother, her school, her school band, schools in her town, and

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2209-21

her town's arts website. In addition, defendant's phone accessed the website for the band at K.Q.'s school on November 27, 2017, the day the band director received the email concerning K.Q. with topless photos of the child attached.

The detective also extracted from defendant's phone: (1) an email to Kbriggs500@gmail.com from U.S. Realty containing a report detailing information about K.Q.'s home address; (2) an email from kkirb500@gmail.com to K.Q.'s grandmother stating, "[i]t's important – it's really important we talk. I tried calling. No answer. It's about the twins, mainly [K.]. Text me at my phone number."; (3) a second email on the same day from the same email address to K.Q.'s grandmother stating, "I need to speak to you about the twins. Mainly [K.]. Tried calling, no answer. Text me back at the number or leave me an email here."; (4) the email to K.Q.'s band director with the subject line "K.Q. [school name] band slut" to which was attached photos of K.Q., two of which show her exposing her breasts while in her underwear; (5) evidence of Internet network connections, including at Bally's; and (6) photos and screen shots that included clothed and topless photos of K.Q.

A grand jury indicted defendant, charging him with: (1) two counts of first-degree endangering the welfare of a child (creation of child pornography), N.J.S.A. 2C:24-4(b)(3); (2) second-degree sexual assault, N.J.S.A. 2C:14-

2(c)(4); (3) two counts of third-degree endangering the welfare of a child (sexual conduct), 2C:24-4(a)(1); (4) second-degree endangering the welfare of a child (distribution of child pornography), N.J.S.A. 2C:24-4(b)(5)(a)(1); (5) third-degree invasion of privacy, N.J.S.A. 2C:14-9(c); (6) third-degree terroristic threats, N.J.S.A. 2C:12-3(a); and (7) fourth-degree stalking, N.J.S.A. 2C:12-10(b).

Defendant moved to suppress the evidence obtained by the warrantless subpoena sent to the ISP of the cell phone number identified by K.Q. Defendant also moved to suppress the evidence obtained by the warrantless subpoenas sent to the ISPs of the IP addresses revealed in response to the first subpoena.

Defendant argued the data revealed by the subpoenas are the equivalent of cell site location information (CSLI) – historical cell phone records showing the location of cell towers contacted by a cell phone number, which establishes the physical location of the operator of a cell phone. The United States Supreme Court afforded CSLI protection from warrantless searches in Carpenter v. United States, 585 U.S. 296 (2018). Defendant argued that because the data revealed in response to the subpoenas, in effect, established his physical location the five times his cell phone number was used to contact computer networks at Las Vegas casinos, such information cannot be obtained without a warrant.

The State opposed the motion, arguing the data obtained by the warrantless subpoenas are not analogous to CSLI because the State obtained limited information relating to defendant's location when he used his cell phone to contact computer networks on five discrete moments over a three-day period. In Carpenter, the State argued, the government obtained information establishing the physical location of a cell phone user that amounted to near perfect surveillance of that person over a four-month period.

In addition, the State argued, under the third-party doctrine, United States v. Miller, 425 U.S. 435, 439 (1976), defendant does not have a reasonable expectation of privacy in information he shared with the ISPs of the casinos when he used their public wireless service to connect with their computer networks.

On July 8, 2019, the trial court issued a written opinion denying the motion. The court found the IP addresses generated when defendant's cell phone contacted computer networks were not akin to the CSLI before the Court in Carpenter. The trial court reasoned that a cell phone user generates IP address data by affirmatively contacting a computer network to access the Internet. CSLI, on the other hand, is created when "a cell phone logs a cell-site . . . by dint of its operation, without any affirmative act on the part of the user beyond

12

powering" the cell phone and "apart from disconnecting the phone from the network, there is no way to avoid leaving a trail of location data." The trial court noted that a cell phone in a user's pocket is continually chronicling the user's movements. The trial court concluded defendant affirmatively contacted the public wireless networks at casinos to access the Internet, negating a reasonable expectation of privacy in the IP addresses generated by those acts.

Moreover, the court found, the evidence obtained by the subpoenas is not similar to the "near perfect surveillance" obtained by the government in Carpenter. Instead, the trial court found, the IP addresses revealed limited information with respect to where defendant contacted public wireless networks at discrete moments over a short period of time. Thus, the trial court concluded, the State did not need to secure a warrant to obtain that information.

The trial court also found that the State complied with the holding in State v. Reid, 194 N.J. 386 (2008), when it issued a grand jury subpoena to obtain defendant's subscriber information.

The State moved for a decision on the admissibility of audio and video-recordings of the February 8, 2018 attempted interview of defendant at the Las Vegas jail. Defendant opposed the motion, arguing any statements he made were the product of an interrogation conducted without a knowing and voluntary

waiver of his <u>Miranda</u> rights.  The trial court held an evidentiary hearing at which one of the officers who attempted to interview defendant testified.  The court also reviewed the recording of the attempted interview.

On July 15, 2019, the trial court issued a written decision granting the State's motion in part.  The court found defendant made an unambiguous assertion of his right to counsel while the officers were attempting to read him <u>Miranda</u> warnings.  The court found all statements made by defendant after the invocation of his right to counsel would be suppressed.  However, the court found, prior to the assertion of his right to counsel, defendant spontaneously stated:  "I never been in New Jersey in my life, I don't know anybody in New Jersey."  Because the officers had not asked defendant any questions reasonably likely to elicit an incriminating response before he made those statements, the court concluded they were admissible.

At trial, the court conferred with counsel with respect to the submission of the February 6, 2018 recording of defendant's statement. The State noted that in the video defendant is seated in front of a cinderblock wall, which made it appear he was in a custodial setting.  After stating that jurors could make the inference defendant was in custody, the State suggested that it would be prudent

14

to play only the audio of the interview. However, both the audio and video recording were played for the jury.

Although the parties agreed on a stopping point in the recordings and that defendant's invocation of counsel would not be shown to the jury, the recordings ended just after the jury heard defendant say, "I want to talk to my attorney about it." At the time, no objection was made by defendant.

The court promptly gave a cautionary instruction about the custodial setting, but not about defendant's invocation of his right to counsel. The court asked defense counsel if the instruction was sufficient. Defense counsel agreed it was sufficient. The court again gave the cautionary instruction with respect to the custodial setting when charging the jury.

The defense did not call witnesses. Defense counsel argued the State failed to prove the identity of the perpetrator, highlighting that no witness identified defendant, K.Q. had a boyfriend at the time, and the video of K.Q. digitally penetrating herself did not come from defendant's phone.

Before the verdict, the State dismissed one count of third-degree endangering the welfare of a child (sexual conduct) and the terroristic threats count. The jury convicted defendant of the remaining counts.

The court denied the State's motion to sentence defendant to an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). After making findings about, and weighing, the statutory aggravating and mitigating factors, the court sentenced defendant on the conviction of: (1) each count of first-degree endangering the welfare of a child (creation of child pornography) to a sixteen-year term of imprisonment, with an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2; (2) second-degree sexual assault to an eight-year term of imprisonment; (3) third-degree endangering the welfare of a child (sexual conduct) to a four-year term of imprisonment; (4) second-degree endangering the welfare of a child (distribution of child pornography) to an eight-year term of imprisonment; and (5) fourth-degree stalking to time served. The court merged the conviction for third-degree invasion of privacy into the conviction of second-degree endangering the welfare of a child.

The court directed all sentences to be served concurrently, except for the sentence on second-degree endangering, which it directed be served consecutively to the sentence on first-degree endangering. Thus, the court sentenced defendant to an aggregate twenty-four-year term of imprisonment

A-2209-21

with an eighty-five percent period of parole ineligibility.  The February 16, 2022

JOC memorialized the convictions and sentence.[3]

This appeal follows.  Defendant raises the following arguments.

POINT I

THE STATE'S WARRANTLESS DATA REQUESTS FOR DEFENDANT'S IP ADDRESS HISTORY – WHICH REVEALED HIS EXACT LOCATIONS – VIOLATED HIS PROTECTIONS AGAINST UNREASONABLE SEARCHES AND SEIZURES AND REQUIRE REVERSAL.

POINT II

THE ADMISSION OF DEFENDANT'S UNCOUNSELED AND UN-MIRANDIZED POLICE STATEMENTS VIOLATED HIS RIGHTS AGAINST SELF-INCRIMINATION AND DENIED HIM A FAIR TRIAL.

POINT III

ALTERNATIVELY, DEFENDANT'S TWENTY-FOUR-YEAR PRISON SENTENCE – TWICE AS MUCH AS HIS PLEA OFFER – IS EXCESSIVE.

---

[3]  The record indicates the trial court found mitigating factor eight, "[t]he defendant's conduct was the result of circumstances unlikely to recur," N.J.S.A. 2C:44-1(b)(8), based on the restrictions, including on Internet access, defendant will face as a registered sex offender once released.  The JOC, however, does not list mitigating factor eight.  We remand for correction of the JOC.

In a supplemental brief, defendant raises the following argument based on a United States Supreme Court decision issued shortly after submission of his principal brief.

> DEFENDANT'S STALKING CONVICTION MUST BE VACATED PURSUANT TO <u>COUNTERMAN V. COLORADO</u>, 143 S. CT. 2106 (2023), BECAUSE IT VIOLATES THE FIRST AMENDMENT.

In a supplemental self-represented brief, defendant raises the following argument.

> THE STATE'S FAILURE TO HAVE THE MASTURBATION VIDEO AUTHENTICATED BY THE VICTIM VIOLATED N.J.R.[E.] 901(4); DENYING THE DEFENDANT THE RIGHT TO HAVE EVIDENCE ADMITTED AGAINST HIM AUTHENTICATED FOR ACCURACY OR CORRECTNESS.

## II.

A.    <u>Defendant's Motion to Suppress.</u>

Our review of the denial of a suppression motion is limited. <u>State v. Handy</u>, 206 N.J. 39, 44-45 (2011). We review a motion judge's factual findings in a suppression hearing with great deference. <u>State v. Gonzales</u>, 227 N.J. 77, 101 (2016). We "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." <u>State v. Gamble</u>, 218 N.J. 412, 424 (2014) (citing <u>State v. Elders</u>,

192 N.J. 224, 243 (2007)). We defer "to those findings of the trial judge which are substantially influenced by [the] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We owe no deference, however, to the trial court's legal conclusions or interpretation of the legal consequences that flow from established facts. Our review in that regard is de novo. State v. Watts, 223 N.J. 503, 516 (2015).

The United States Constitution and the New Jersey Constitution protect an individual from unreasonable searches and seizures. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Generally, the inquiry regarding whether a search warrant is necessary depends on whether the individual has a reasonable expectation of privacy in the information obtained. Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). "Expectations of privacy are established by general social norms . . . ." Robbins v. California, 453 U.S. 420, 428 (1981). As technology advances, courts must "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Carpenter, 585 U.S. at 305 (omission in original) (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001)).

Defendant argues a warrant was necessary for the State to obtain the IP addresses generated when the cell phone number identified by K.Q. contacted computer networks over a three-day period. Several precedents guide our analysis of defendant's argument.

In Reid, the State alleged the defendant logged onto the website of her employer's business supplier from her home computer and changed her employer's password and shipping address to a nonexistent location in an act of retaliation. 194 N.J. at 389. The supplier's website captured the defendant's IP address and gave that information to her employer, who turned it over to police. Ibid. The IP address was registered to Comcast, an ISP. Ibid.

A municipal court issued a subpoena to Comcast seeking information relating to the IP address during the three-hour period the supplier's website was accessed. Id. at 392-93. In response to the subpoena, Comcast identified the defendant as the subscriber for the IP address. Id. at 393. Comcast also provided the defendant's address, telephone number, type of service provided, IP assignment, account number, email address, and method of payment. Ibid. On the strength of that information, the defendant was arrested and charged with second-degree computer theft, N.J.S.A. 2C:20-25(b). Ibid.

The defendant moved to suppress the information obtained through the subpoena. Ibid. Both the trial court and this court suppressed the information, finding, among other things, the defendant had an expectation of privacy in her Internet subscriber information. Id. at 393-94.

The Supreme Court affirmed. Id. at 407. The Court noted that in the preceding "twenty-five years, a series of New Jersey cases has expanded the privacy rights enjoyed by citizens of this state." Id. at 397. The Court noted that in one case, State v. Hunt, 91 N.J. 338 (1982), it found "telephone toll billing records are 'part of the privacy package'" protected from a warrantless search. Ibid. (quoting Hunt, 91 N.J. at 347). In Hunt, the Court observed "[t]he telephone has become an essential instrument in carrying on our personal affairs" and that a list of telephone numbers dialed in the privacy of one's home "could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life." 91 N.J. at 346, 48 (quoting Smith v. Maryland, 442 U.S. 735, 748 (1979) (Stewart, J., dissenting)); see Reid, 194 N.J. at 397. In addition, the Court noted that a person "is entitled to assume that the numbers he [or she] dials in the privacy of his [or her] home will be recorded solely for the telephone company's business purposes." Hunt, 91 N.J. at 347.

21

Similarly, the Court observed, it previously found bank account holders had a reasonable expectation of privacy in their bank account records. Id. at 348. In State v. McAllister, 184 N.J. 17, 31 (2005), the Court noted that bank accounts "have become an indispensable part of modern commerce" for our citizens. The McAllister Court reasoned that "[b]ank records, like long distance billing records . . . reveal[] many aspects of [a depositor's] personal affairs, opinions, habits[,] and associations." Id. at 30-31. In addition, the Court found that when bank account holders voluntarily give information to banks, "they do so with the understanding that it will remain confidential" and disclosure is done to facilitate financial transactions, not to enable banks to broadcast the affairs of their customers. Id. at 31.

Applying those precedents, the Reid Court held:

> ISP records share much in common with long distance billing information and bank records. All are integrally connected to essential activities of today's society. Indeed, it is hard to overstate how important computers and the Internet have become to everyday, modern life. Citizens routinely access the Web for all manner of daily activities: to gather information, explore ideas, read, study, shop, and more.
>
> Individuals need an ISP address in order to access the Internet. However, when users surf the Web from the privacy of their homes, they have reason to expect that their actions are confidential. Many are unaware that a numerical IP address can be captured by the

websites they visit. More sophisticated users understand that that unique string of numbers, standing alone, reveals little if anything to the outside world. Only an [ISP] can translate an IP address into a user's name.

[194 N.J. at 398.]

The Court continued:

In addition, while decoded IP addresses do not reveal the content of Internet communications, subscriber information alone can tell a great deal about a person. With a complete listing of IP addresses, one can track a person's Internet usage. "The government can learn the names of stores at which a person shops, the political organizations a person finds interesting, a person's . . . fantasies, her health concerns, and so on." Daniel Solove, The Future of Internet Surveillance Law, 70 Geo. Wash. L. Rev. 1264, 1287 (2004). Such information can reveal intimate details about one's personal affairs in the same way disclosure of telephone billing records does. Although the contents of Internet communications may be even more revealing, both types of information implicate privacy interests.

[Id. at 398-99.]

The Court held: "[f]or all those reasons, we find that Article I, Paragraph 7, of the New Jersey Constitution protects an individual's privacy interest in the subscriber information he or she provides to an [ISP]." Id. at 399.

The Court rejected the argument the defendant waived her privacy interest by voluntarily turning information over to her ISP. Ibid. "In the world of the

Internet, the nature of the technology requires individuals to obtain an IP address to access the Web. Users make disclosures to ISPs for the limited goal of using that technology and not to promote the release of personal information to others." Ibid. "Under our precedents, users are entitled to expect confidentiality under these circumstances." Ibid. (footnote omitted). Finally, the Court held that ISP subscriber information could be obtained by the State with a grand jury subpoena without obtaining a warrant. Id. at 403-04.

In State v. Earls, 214 N.J. 564, 568 (2013), the Court considered "whether people have a constitutional right of privacy in cell-phone location information." In Earls, an officer obtained an arrest warrant for the defendant, who police believed was with his endangered girlfriend. Id. at 571. In an effort to find them, the officer contacted T-Mobile, the service provider for a cell phone believed to be in defendant's possession. Ibid. Three times that evening, T-Mobile provided information about the location of the cell phone via cell phone tower transmissions. Ibid. Ultimately, the officer located the defendant and his girlfriend at a motel, where a search of their luggage revealed stolen property and marijuana. Id. at 572. The defendant was arrested and charged with several offenses. Ibid.

He moved to suppress the evidence, arguing he had a reasonable expectation of privacy in his cell phone location data, requiring the officer to get a warrant before securing his location data from his service provider. Id. at 573. The trial court and this court denied the defendant's motion to suppress. Ibid.

The Supreme Court reversed. Id. at 593. It found:

> Using a cell phone to determine the location of its owner can be far more revealing than acquiring toll billing, bank, or Internet subscriber records. It is akin to using a tracking device and can function as a substitute for 24/7 surveillance without police having to confront the limits of their resources. It also involves a degree of intrusion that a reasonable person would not anticipate. Location information gleaned from a cell-phone provider can reveal not just where people go – which doctors, religious services, and stores they visit – but also the people and groups they chose to affiliate with and when they actually do so. That information cuts against a broad range of personal ties with family, friends, political groups, health care providers, and others. In other words, details about the location of a cell phone can provide an intimate picture of one's daily life.
>
> [Id. at 586 (citations omitted).]

The Court also noted cell phones "blur the historical distinction between public and private areas" and CSLI "does more than simply augment visual surveillance in public areas." Ibid. "Finally," the Court observed,

cell-phone use has become an indispensable part of modern life. The hundreds of millions of wireless devices in use each day can often be found near their owners – at work, school, or home, and at events and gatherings of all types. And wherever those mobile devices may be, they continuously identify their location to nearby cell towers so long as they are not turned off.

[Id. at 586-87.]

The Court also found

cell phones are not meant to serve as tracking devices to locate their owners wherever they may be. People buy cell phones to communicate with others, to use the Internet, and for a growing number of other reasons. But no one buys a cell phone to share detailed information about their whereabouts with the police.

[Id. at 587.]

The Court concluded:

For the reasons discussed, we conclude Article I, Paragraph 7 of the New Jersey Constitution protects an individual's privacy interest in the location of his or her cell phone. Users are reasonably entitled to expect confidentiality in the ever-increasing level of detail that cell phones can reveal about their lives. Because of the nature of the intrusion, and the corresponding, legitimate privacy interest at stake, we hold today that police must obtain a warrant based on a showing of probable cause, or qualify for an exception to the warrant requirement, to obtain tracking information through the use of a cell phone.

[Id. at 588.]

In Carpenter, on which defendant primarily relies, the Court considered "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements."  585 U.S. at 300.  In that matter, law enforcement officials investigating a series of robberies obtained court orders to compel Carpenter's ISPs to disclose identified telecommunications records of Carpenter. Id. at 301-02.  The orders were obtained pursuant to a statute, which did not require a showing of probable cause or a warrant.  Id. at 302.  The orders required the disclosure of CSLI at call origination and call termination for incoming and outgoing calls during the four-month period when the robberies occurred.  Ibid.  In response to the orders, the Government received 12,898 location points over 127 days cataloging Carpenter's movements.  Ibid.

After Carpenter was charged with the robberies and related crimes, he moved to suppress the CSLI provided in response to the orders, arguing the seizure of those records violated the Fourth Amendment because the orders were obtained without a warrant supported by probable cause.  Ibid.  The District Court denied the motion.  Ibid.

At trial, an expert testified with respect to the CSLI and produced a map based on that data placing Carpenter's cell phone near four of the robberies at the times they took place. Ibid. The jury convicted Carpenter. Id. at 303.

The Sixth Circuit affirmed Carpenter's convictions, holding he lacked a reasonable expectation of privacy because he shared the location information with his wireless carrier. Ibid.

The Supreme Court reversed. Id. at 321. The Court began its analysis by holding that "[g]iven the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection." Id. at 309. The Court continued,

> [w]hether the Government employs its own surveillance technology . . . or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI. The location information obtained from Carpenter's wireless carriers was the product of a search.
>
> [Id. at 309-10.]

The Court noted that "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts." Id. at 311. The data "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political,

professional, religious, and sexual associations.'" Ibid. (quoting United States v. Jones, 565 U.S. 400, 415 (2012)).  In addition, the Court observed that people "compulsively carry cell phones with them all the time" and "when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." Id. at 311-12.  The Court held:  "Having found that the acquisition of Carpenter's CSLI was a search, we also conclude that the Government must generally obtain a warrant supported by probable cause before acquiring such records." Id. at 316.

We agree the limited information obtained by the subpoenas in this matter is not the equivalent of the CSLI before the Court in Carpenter.  In response to the subpoenas, the State obtained IP addresses generated when the cell phone number assigned to defendant contacted publicly available computer networks to access the Internet five times over a three-day period.  This information is nowhere close to the "near perfect surveillance" of the defendant over more than four months in Carpenter.  The privacy interests implicated by the sweeping nature of the information disclosed without a warrant in Carpenter are not present here.  The State did not obtain information tracking defendant's movements over an extended period of time by virtue of information passively conveyed by a cell phone in his possession.

29

The closer question is whether the IP addresses revealed in response to the first subpoena and the identity of the entities that maintained the computer networks associated with those IP addresses revealed in response to the second set of subpoenas is the equivalent of the CSLI found to be entitled to State constitutional protection in Earls. Together, the information disclosed in response to the subpoenas establishes that a cell phone number assigned to defendant was used to contact publicly available computer networks at five Las Vegas casinos over a three-day period. This information is highly suggestive that defendant, if in possession of his cell phone, was present at the casinos on those five occasions. In effect, the information revealed in response to the subpoenas revealed defendant's location at five moments over three days.

Thus, the information revealed in response to the subpoenas was akin to the CSLI in Earls, which showed his location at three moments during one evening. The distinction drawn by the trial court is that the CSLI in Earls was passively generated by continuous communications between Earls's cell phone and nearby cell towers, while the information revealed in response to the subpoenas was generated when defendant affirmatively used his cell phone to contact publicly available computer networks at the casinos to access the

Internet. In so doing, the trial court reasoned, defendant cannot reasonably expect a privacy interest in his presence at the casinos at those discrete moments.

Although the distinction is fine, in these narrow circumstances, we find it sufficient to place the IP addresses generated by defendant's cell phone outside the category of information protected from a warrantless search under the state constitution. The limited information revealed in response to the subpoenas does not track defendant's movements and does not reveal the websites he accessed from the privacy of his home, see Reid, 194 N.J. at 398, where his expectation of privacy would be heightened. Instead, the information requested was the IP addresses generated by defendant's cell phone when he contacted a computer network to access the Internet, circumstances requiring an affirmative act to access the Internet outside the service provided by his ISP.

We view defendant's argument as a request to extend the holding in Reid and Earls to IP addresses a cell phone user generates when he or she contacts a publicly available computer network to access the Internet. We decline the invitation to apply existing Supreme Court precedents to information not previously found to be protected from a warrantless search under the federal or state constitutions.

31

The trial court did not hold an evidentiary hearing on defendant's suppression motion. Our holding is based on our understanding that the IP addresses revealed in response to the subpoena served on TextNow, Inc. were generated when the user of the cell phone affirmatively contacted the publicly available wireless network at the casinos and were not generated passively by the user's mere presence at the casinos. In addition, as we understand the record, the type of information found to be entitled to state constitutional protection in Reid was disclosed in this instance in response to a grand jury subpoena in accordance with the Supreme Court's holding in Reid.

B.      Admission of Defendant's Statement to Police.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "Our law maintains 'an unyielding commitment to ensure the proper admissibility of confessions.'" State v. Sims, 250 N.J. 189, 211 (2022) (quoting State v. Vincenty, 237 N.J. 122, 132 (2019)).

Both the Fifth Amendment and the State Constitution bar the admission of suspect's statements made during custodial interrogation without being

advised of the Miranda warnings. State v. Hubbard, 222 N.J. 249, 265 (2015). Whether a suspect was subject to custodial interrogation involves two inquires: whether he was in custody and whether he was subject to interrogation. Id. at 265-66.

Here, the State concedes defendant was in custody at the time of the February 6, 2018 attempted interview. The trial court granted the State's motion in part based on its finding defendant was not interrogated by the officers before he said he had never been to New Jersey and did not know anyone in New Jersey.

Interrogation is not limited to overt questioning about a specific crime. Instead, interrogation also includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." State in re A.A., 240 N.J. 341, 354 (2020) (alteration in original) (quoting Hubbard, 222 N.J. at 267). Without a waiver of Miranda rights, "the police may not ask questions or make statements which open up a more generalized discussion relating directly or indirectly to the investigation." State v. Ward, 240 N.J. Super. 412, 419 (App. Div. 1990).

The test for interrogation does not require bad faith on the part of the police, see A.A., 240 N.J. at 358, and "focuses primarily upon the perceptions of the suspect . . . [because] the Miranda safeguards were designed to vest a

suspect in custody with an added measure of protection against coercive police practices." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). A significant factor is the level of "compulsion inherent in" the custodial environment. See Ward, 240 N.J. Super. at 417. But that compulsion must be "above and beyond that inherent in custody itself." Id. at 418 (quoting Innis, 446 U.S. at 300). "In the absence of interrogation, a spontaneous statement is admissible in evidence regardless of the failure to provide Miranda warnings." State v. Marks, 201 N.J. Super. 514, 529 (App. Div. 1985).

Defendant argues that the officers' unannounced appearance at the county jail and the location of the interview in a locked detention room added inherent compulsion to their interaction with him. In addition, he argues that despite the absence of questioning, the officers' words and actions were designed to elicit a response from him. We have reviewed the recording of the interview and find no basis on which to disturb the trial court's decision.

Although the interaction took place in a locked room at a jail, we see nothing in the actions and words of the officers suggesting coercion. Defendant appears relaxed and in control during the attempted interview. From the start of the encounter, defendant was not forthcoming with the officers, asserted his right to counsel, and firmly refused to answer their questions, even when one

officer casually asked if he watched football. Defendant's statement about his lack of familiarity with New Jersey was a spontaneous remark which was unconnected to any words or acts by the officers designed to elicit a response.

There is no doubt it was error to play for the jury the portion of the recordings in which defendant asserts his right to counsel. "'[T]rial courts should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel' from the statement that the jury hears." State v. Clark, 251 N.J. 266, 292 (2022) (quoting State v. Feaster, 156 N.J. 1, 75-76 (1998)). However, "'[a] trial court's failure to follow the Feaster stricture of excision or a cautionary instruction does not necessarily equate to reversible or plain error'; rather, a harmful error analysis is warranted to determine whether the defendant was deprived of a fair trial." Ibid. (quoting State v. Tung, 460 N.J. Super. 75, 94-95 (App. Div. 2019)).

In the absence of an objection by defendant's counsel, we review the record for plain error. State v. Ross, 229 N.J. 389, 407 (2017). Our inquiry is to determine whether the alleged error was "clearly capable of producing an unjust result . . . ." R. 2:10-2. "Not any possibility of an unjust result will suffice as plain error, only 'one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v.

Coclough, 459 N.J. Super. 45, 51 (App. Div. 2019) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" Clark, 251 N.J. at 287 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

Here, the inadmissible statement was fleeting. The detective who was testifying when the recording was played for the jury did not mention the invocation. The assistant prosecutor did not mention defendant's invocation of counsel during summation. In addition, the evidence establishing defendant's guilt was strong. He was in possession of photos, text messages, emails, and web searches related to K.Q., her relatives, her home, her school, and the band director who received a pornographic image of the child from defendant's email address. In light of the direct evidence of defendant's criminality, we do not see plain error warranting reversal of defendant's convictions.

Defendant did not object to playing the recording based on the jail uniform he was wearing during the February 6, 2018 attempted interview. "New Jersey courts have been 'especially vigilant in protecting a defendant's right not to be compelled to appear at trial in prison attire' in order to protect the presumption of innocence." State v. Herrera, 385 N.J. Super. 486, 498 (App. Div. 2006)

36

(quoting State v. Maisonet, 166 N.J. 9, 18 (2001)); accord Estelle v. Williams, 425 U.S. 501, 512 (1976). This is so because "the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment," undermining the presumption of innocence. Estelle, 425 U.S. at 504-05. "[A] defendant's outward appearance can threaten the fairness of proceedings." Maisonet, 166 N.J. at 17.

This rule extends to photos or videos of a defendant in jail attire. State v. Burton, 309 N.J. Super. 280, 287-89 (App. Div. 1998). In Burton, the State admitted photos from a pretrial photo array, which included a photo of the defendant in orange jail clothing. Id. at 286. We held the photo should have been excluded under N.J.R.E. 403(a) because its minimal probative value "was substantially outweighed by the risk of undue prejudice in bringing to the attention of the jury the fact that defendant had previously been arrested and incarcerated." Id. at 288. We noted that "[t]he burden is on the party urging exclusion of the evidence to convince the court that the probative value is substantially outweighed by the risk of undue prejudice." Ibid.

Again, in the absence of an objection by defendant, we review the record for plain error. We find none. The recording was brief. In addition, the court instructed the jury twice, once when the recording was played and once during

37

final instructions, with respect to the custodial setting of the attempted interview. The fact that defendant appeared in the recording in jail garb added no additional prejudicial information where the jurors were aware he met with the officers in a custodial setting. In addition, as we previously noted, the strength of the evidence of defendant's criminality was high.

C.    Stalking Conviction.

Defendant argues under the recent opinion in Counterman his conviction for stalking violated the First Amendment. We agree.

The First Amendment to the United States Constitution, applicable to the states by the Fourteenth Amendment, protects the freedom of speech from abridgment by laws. U.S. Const. amend. I; Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, 585 U.S. 878 (2018). However, "[t]rue threats of violence . . . lie outside the bounds of the First Amendment's protection." Counterman, 600 U.S. at 72. In order to be consistent with the "commands of the First Amendment," statutes that criminalize "a form of pure speech" must distinguish between true threats of violence and constitutionally protected speech. Watts v. United States, 394 U.S. 705, 707 (1969). "Under Watts, a person may be convicted of a true threat only if their speech, when taken in context, actually threatens violence." Fair, 256 N.J. at 229.

In Counterman, the United States Supreme Court examined a conviction under a Colorado stalking statute based on the defendant's alleged threatening remarks to the victim. 600 U.S. at 69-73. The Court examined the mens rea necessary to convict a defendant of a pure speech crime based on true threats of violence and held "that a true threats prosecution 'requires proof that the defendant had some subjective understanding of the threatening nature of his statements,' but that a 'specific intent to threaten the victim' is not required." Fair, 256 N.J. at 230 (quoting Counterman, 600 U.S. at 69). "Instead, a mental state of recklessness 'is enough.'" Ibid. (quoting Counterman, 600 U.S. at 73).

> Counterman reiterated that true threats of violence must be objectively threatening to a reasonable observer when taken in context. . . .
>
> But the Court held that in addition to this objective component, the defendant must also have a subjective mental state in order for a true threats prosecution to comport with the First Amendment. After reviewing the mens rea requirements for some other forms of historically unprotected speech . . . the Court concluded that recklessness was the correct mens rea to require for true threats.
>
> [Id. at 230-31 (citing Counterman, 600 U.S. at 73, 78-82).]

In Fair, our Supreme Court decided "whether a prosecution for terroristic threats under N.J.S.A. 2C:12-3(a) premised on a mens rea of recklessness is

constitutional under the First Amendment to the United States Constitution and Article I, Paragraph 6[,]" the free speech provision of the State Constitution. Id. at 219. The statute "provides that a person is guilty of third-degree terroristic threats 'if he threatens to commit any crime of violence with the purpose to terrorize another or . . . in reckless disregard of the risk of causing such terror or inconvenience.'" Ibid. (omission in original).

The Court noted that Article I, Paragraph 6 is often interpreted "as being 'co-extensive with the First Amendment," and that the Court uses "federal constitutional principles [to] guide [its] analysis." Id. at 232 (first alteration in original) (quoting E & J Equities, Ltd. Liab. Co. v. Bd. of Adjustment of Franklin, 226 N.J. 549, 568 (2016)). In certain circumstances, the Court has "held that our State Constitution's free speech clause provides 'greater protection than the First Amendment.'" Ibid. (quoting Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482, 492 (2012)). However, the Court held:

> We substantially adopt the Counterman standard and hold that in a criminal prosecution for a true threat of violence under N.J.S.A. 2C:12-3(a), a mens rea of recklessness suffices for purposes of both the First Amendment to the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution.
>
> [Id. at 232-33.]

We, therefore, apply the holding in <u>Counterman</u> to determine the validity of defendant's conviction. Defendant was convicted of fourth-degree stalking under N.J.S.A. 2C:12-10(b). That statute provides, "[a] person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress." N.J.S.A. 2C:12-10(b). The statute defines "[c]ause a reasonable person to fear" as "to cause fear which a reasonable victim, similarly situated, would have under the circumstances." N.J.S.A. 2C:12-10(a)(4). Both the indictment and the verdict sheet stated that the stalking charge was based solely on "threatening [K.Q.] via text messages."

During the final jury charge, the trial court read the indictment and applicable portions of the statute and instructed that the State was required to prove two elements: (1) "that defendant purposely or knowingly engaged in a course of conduct directed at a specific person, namely [K.Q.]"; and (2) "that defendant's course of conduct would cause a reasonable person to fear for his or her safety, fear for the safety of a third person or suffer emotional distress."

Thus, New Jersey's stalking statute suffers from the same defect as Colorado's statute in <u>Counterman</u>. It does not require the defendant have any

41

subjective awareness of the threatening nature of the communications. Although the statute requires that the defendant purposely or knowingly engage in the conduct (i.e., sending the text messages), it does not require any awareness of the threatening nature of the communications. See State v. Gandhi, 201 N.J. 161, 187 (2010) (in interpreting an earlier version of the stalking statute, holding that the purposeful-or-knowing mens rea did not apply to the reasonable person clause of the statute).

Instead, as the trial court instructed, the State had to prove only that defendant purposely or knowingly sent the texts to K.Q. and that an objectively reasonable victim would have feared for her safety or suffered emotional distress. Because the State was not required to prove beyond a reasonable doubt that defendant subjectively understood the threatening nature of the texts to a degree of at least recklessness, his stalking conviction violated the First Amendment.

We note the State's argument that the holding in Counterman should not be accorded pipeline retroactivity "rendering it applicable in all future cases, the case in which the rule was announced, and any cases still on direct appeal." State v. G.E.P., 243 N.J. 362, 386 (2020). Our Supreme Court applied the holding in Counterman in Fair, which was issued while the State's appeal in Fair

was pending. Fair, 256 N.J. at 226. We view this as the Court's determination that Counterman is to be applied at least with pipeline retroactivity.

D.    Authentication of Video.

In his self-represented brief, defendant argues the trial court erroneously admitted the video of K.Q. stripping and digitally penetrating herself because it was not the video that was the subject of the indictment. In addition, he argues the trial court erred when it admitted the video into evidence without proper authentication under N.J.R.E. 901(4). We have considered these arguments, and the others he raises in his self-represented supplemental brief, and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

E.    Sentence.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the]

case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In State v. Yarbough, 100 N.J. 627, 644 (1985), our Supreme Court set forth the following criteria as "general sentencing guidelines" for evaluating the threshold question of whether to impose concurrent or consecutive sentences for multiple offenses pursuant to N.J.S.A. 2C:44-5(a):

(1) there can be no free crimes in a system for which the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence shall be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e)  the convictions for which the sentences are to be imposed are numerous.

(4)  there should be no double counting of aggravating factors; [and]

(5)  successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .

[Id. at 643-44.[4]]

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory range."  State v. Abdullah, 184 N.J. 497, 514 (2005).  "[T]he five 'facts relating to the crimes' contained in Yarbough's third guideline should be applied qualitatively, not quantitatively," and consecutive sentences may be imposed "even though a majority of the Yarbough factors support concurrent sentences."  State v. Carey, 168 N.J. 413, 427-28 (2001); see also State v. Molina, 168 N.J. 436, 442-43 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims").

---

[4]  In Yarbough, the Court identified a sixth factor, limiting the cumulation of consecutive sentences for multiple offenses.  100 N.J. at 644.  That factor was eliminated by the Legislature's amendment of N.J.S.A. 2C:44-5(a), to provide that "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses."

In Abdullah, the Court reminded trial judges "that when imposing either consecutive or concurrent sentences, '[t]he focus should be on the fairness of the overall sentence,' and that they should articulate the reasons for their decisions with specific reference to the Yarbough factors."  184 N.J. at 515 (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).  In State v. Torres, 246 N.J. 246 (2021), the Court held that when imposing lengthy consecutive sentences, "an explanation for the overall fairness of a sentence by the sentencing court is required" in order "to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'"  Id. at 272 (alterations in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

Defendant argues the trial court erred when it directed his sentence for second-degree endangering the welfare of a child be served consecutively to the sentences on his other convictions.  He argues all the offenses stem from the same course of conduct:  using the Internet to solicit and distribute sexually explicit content involving K.Q.  The court, however, found defendant's solicitation of K.Q. to create child pornography for his prurient interest and his distribution of that pornography to K.Q.'s band director inflicted distinct harms on K.Q.  The court found defendant engaged in the targeted distribution of the

46

pornography to a person with authority in K.Q.'s life in retribution for K.Q. limiting contact with him after she started a relationship with a boyfriend with the purpose of inflicting significant emotional and mental harm on K.Q. The court found that as a result of defendant's distribution of the pornography to a member of her school's staff, K.Q. suffered a harm distinct from the harm inflicted on her as a result of having made the pornography at defendant's direction.

The court also found defendant's purposeful distribution of the video to K.Q.'s band director was "particularly heinous and depraved and . . . the culmination of a pattern of conduct on the part of the defendant designed to terrorize and inflict harm on the thirteen-year-old victim." The trial court's decision with respect to the imposition of a consecutive sentence on one conviction is well supported by the record.

Nor are we persuaded the trial court increased defendant's sentence because he maintained his innocence and did not accept a plea offer. In addition, the record does not support defendant's argument the trial court improperly weighed the aggravating and mitigating factors. Those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part, reversed in part, and vacated in part. The matter is remanded to the trial court for retrial of the stalking charge and correction of the JOC. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division